## HORTH v AMERICAN AGGREGATES CORPORATION

Ohio Appeals, 2nd Dist, Darke Co.

No. 565. Decided Feb. 6, 1940.

Kenneth D. Carter, Cleveland, and Wilbur D. Spidel, Greenville, for plaintiff-appellee.

Hole & Hole, Greenville, and H. C. Allread, Columbus, for defendant-appellant.

### OPINION

By BARNES, J.

The above entitled cause is now being determined as an error proceeding by reason of defendant's appeal on questions of law from the judgment of the Court of Common Pleas or Darke County, Ohio.

Plaintiff's action was predicated upon the claim that the defendant maliciously induced the Cable Co., Inc., Canton, Ohio, to breach a contract which the plaintiff had with the Cable Co., to plaintiff's damage in the sum of $29,594.00, with interest.

During the month of May, 1935, the United States Government duly advertised for bids for furnishing of labor, equipment, and materials for the doing of certain work, more fully covered in certain specifications, for the relocation of the Baltimore & Ohio Railroad—Beach City Reservoir.

This Government contract was very large and attracted a great many bidders under the separately numbered specifications.

The Cable Co., a Canton, Ohio, corporation engaged in construction work, was interested in certain items under the specifications.

Prior to the date set in the advertisement for presentation of bids, the Cable Co. wrote to the plaintiff in Cleveland, Ohio, (the latter being a large railroad construction company) asking if the latter would be interested in bidding them on certain named specifications, and, if so, to submit proposals.

The plaintiff, H. H. Horth, doing business under the trade name of Acme Railroad Construction Company, was interested and so informed the Cable Co. and prior to the day of bidding submitted written proposal on certain designated numbers and specifications, and stipulated that it was desired that the Cable Co. indicate before the time of opening bids whether or not plaintiff's proposition would be accepted.

The designated date for submitting and opening bids was May 7, 1935.

On the evening before the day of the bidding the plaintiff and representatives of the Cable Co. met at a room in a hotel and after conference and some modifications the Cable Co. in writing accepted plaintiff's proposals. The Government had previously prepared and

made available for all interested parties blank forms of contract with specifications and plainly indicating where and how blanks were to be filled out by prospective bidders.

The Cable Co. submitted its bid on one of these general forms and using under the numbered specifications, upon which plaintiff had submitted proposals, the identical figures furnished by plaintiff and agreed upon in writing on the evening of the day previous. When the bids were opened, it was apparent that the Cable Co. was the low bidder. The Cable Co. in their bid on page "i" of the specifications in answering data under the heading, "TRACK LAYING AND BALLAST EQUIPMENT," inserted the following: "Will sublet to Acme Railroad Construction Co. of Cleveland who will have all the necessary equipment for this work." The formal contract between the Cable Co. and the United States Government was executed May 23, 1935, but was executed subject to a stipulation that the same would be approved by the Government Engineers.

Such approval was entered by R. G. Powell of the Corps of Engineers on July 2, 1935. Plaintiff claims this written proposal and the Cable Company's executed acceptance thereof constituted a binding contract, and, if nothing to the contrary appears, we think this claim is correctly made.

However, there is a serious question as to whether or not the parties so treated it. On the day following the opening of the bids the plaintiff returned to Cleveland, and thereafter within the next week or two at irregular intervals there were communications between the plaintiff and Cable Co. by telephone or otherwise resulting in plaintiff and his counsel going to Canton and meeting with officers of the Cable Co. at the office of Judge Clark, the latter's counsel. In the conference there developed some differences. At this meeting, or a subsequent meeting, plaintiff through his attorney submitted what he designated as a supplemental or working agreement covering details. This was rather a lengthy document. The Cable Co. made some objections to it, but apparently not on the ground that plaintiff's proposal and the Cable Company's acceptance on May 6th constituted the contract. In the trial of the case the question was raised that the Secretary of the Cable Co. did not have the authority to sign for the company. We do not think that this claim is well grounded, and, therefore, dismiss from further comment. Both parties in their conference following the opening of bids seemed to proceed on the theory that it was customary under such circumstances for the contractor and subcontractor to enter into a formal contract covering detail and working arrangements. The Cable Co. contended that the supplemental or working contract submitted by plaintiff altered the terms of plaintiff's original proposal.

Plaintiff denies this claim. This document was introduced in evidence as Exhibit 10. At a subsequent meeting sometime in July the Cable Co. claimed that the question was raised and discussed that plaintiff had quoted to other bidders a lower price than was made in his written proposal and that this was in violation of his inducing proposal, that he had made no quotations to any other contractor at a lower price, except to one where an $800.00 deduction had been made. The plaintiff denies much, if not all, of this detail. In any event, the supplemental contract was never executed and plaintiff did not do the work.

Defendant in its answer, among other things, denied the allegations of the petition that it had maliciously induced the Cable Co. to breach its contract. In the trial of the case a verdict was returned for the plaintiff in the sum of $13,300.00. Motion for new trial was duly filed, overruled, and judgment entered on the verdict.

This is the final order from which defendant prosecutes appeal in this court on question of law. Appellant sets

out 12 separately numbered assignments of error as follows:

"1. The Common Pleas Court erred at the trial in overruling the defendant's motion for judgment on the pleadings.

2. The Common Pleas Court erred at the trial in overruling the defendant's motion at the conclusion of the plaintiff's case, and after plaintiff had rested his case, to arrest the case from the jury and to direct a verdict in favor of the defendant.

3. Said Common Pleas Court erred at the trial in overruling the defendant's motion at the conclusion of all the testimony offered in this case, and after both plaintiff and defendant had rested, to arrest the case from the jury and to direct a verdict in favor of the defendant.

4. Said Common Pleas Court erred in overruling the motion of the defendant for final judgment, notwithstanding the verdict.

5. The verdict and judgment in the Common Pleas Court are against the weight of the evidence and contrary to law.

6. Said Court erred in admitting evidence offered by plaintiff and objected to by defendant, to the admission of which the defendant, at the time, excepted.

7. The Court erred in excluding evidence offered by the defendant, to the exclusion of which, by the Court, the defendant, at the time, excepted.

8. The Court erred in refusing to charge the jury as requested by defendant.

9. The Court erred at the trial in giving to the jury before argument, special instructions Nos. 1, 2, and 3, as requested by the plaintiff.

10. The Court erred at the trial in refusing to give to the jury before argument, special instructions Nos. 6 and 7, as requested by the defendant.

11. The Court erred in its general charge to the jury.

12. And for other errors apparent on the record."

We will discuss these several assignments of errors in the same order as presented above, except that in some instances separately numbered assignments may be grouped.

I.

"THE COMMON PLEAS COURT ERRED AT THE TRIAL IN OVERRULING DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS."

This assignment in effect raises the question that the amended petition does not state a cause of action. Defendant raised the same question by demurrer which after hearing was overruled.

We find no merit under this assignment.

II.

"THE COMMON PLEAS COURT ERRED AT THE TRIAL IN OVERRULING THE DEFENDANT'S MOTION AT THE CONCLUSION OF THE PLAINTIFF'S CASE, AND AFTER PLAINTIFF HAD RESTED HIS CASE, TO ARREST THE CASE FROM THE JURY AND TO DIRECT A VERDICT IN FAVOR OF THE DEFENDANT."

III.

"SAID COMMON PLEAS COURT ERRED AT THE TRIAL IN OVERRULING THE DEFENDANT'S MOTION AT THE CONCLUSION OF ALL THE TESTIMONY OFFERED IN THIS CASE, AND AFTER BOTH PLAINTIFF AND DEFENDANT HAD RESTED, TO ARREST THE CASE FROM THE JURY AND TO DIRECT A VERDICT IN FAVOR OF THE DEFENDANT."

IV.

"SAID COMMON PLEAS COURT ERRED IN OVERRULING THE MOTION OF THE DEFENDANT FOR FINAL JUDGMENT, NOTWITHSTANDING THE VERDICT."

Assignments of errors Nos. 2, 3 and 4 in the interest of shortening the opinion will be grouped. One of the issues presented under the pleadings was whether or not plaintiff through a preponderance of the evidence established the existence of a contract between the plaintiff and the Cable Company.

The Court very clearly presented this issue to the jury in his charge.

It necessarily follows that the jury found the existence of such a contract since their verdict was for the plaintiff. The evidence is sufficient to support this issue.

A second important question presented to the jury in the Court's charge is whether or not the plaintiff or the entire record presents any evidence that the defendant improperly induced the plaintiff to breach its contract, and, if so, was such conduct malicious.

The determination of this question requires a very careful reading of the entire record, which we have done. Counsel for plaintiff in presenting his case in chief called but two witnesses and the testimony of these two witnesses, together with certain identified and admitted exhibits, constitute all the evidence presented by plaintiff in chief. The first witness called was the plaintiff. His testimony comprises some 85 pages of the typewritten record. By far and large the greater portion of his testimony relates to the claimed contract between himself and the Cable Co. In some parts of his testimony are narrated claimed conversations that he had with Mr. E. E. Mills, District Manager for the defendant company in the Canton district, who was personally present at the time of the letting and both before and after very active in his efforts to sell gravel and sand necessary to be used in great quantities on the project.

While the plaintiff, Mr. Horth, was on the stand, a letter written by Mr. Carter, Attorney for plaintiff, to the defendant company at Greenville, dated July 13, 1935, was called for and produced by attorney for the defendant with the admission that it was received by the defendant company on July 15, 1935. This letter, among other things, and in substance advised the defendant company that it was written at the request of the plaintiff company and was to advise the defendants that the plaintiff had a written contract with the Cable Co., dated July 13, 1935, to do the track work specified in the contract for relocation of the Baltimore & Ohio Railroad. Other parts of the letter are quoted verbatim and are as follows:

"Mr. Mills, Manager of your Massillon plant, has informed Mr. Horth of the Acme Railroad Company that the Cable Company, Inc., has discussed the matter of the same work with you. This letter is being written to advise you that we shall hold all parties responsible for any breach of this contract."

Also two letters from plaintiff to defendant in November and in December and defendant's reply which will be referred to later.

The second witness was Mr. Fred E. Coppock, President of the defendant company, whose place of business was Greenville, Ohio.

We now return to the testimony of the plaintiff and have attempted to segregate from the great mass any and all evidence that in any manner refers to the defendant company. Aside from conversations had with Mr. E. E. Mills and the letter above referred to, we find nothing. In the interest of shortening this opinion, we will not in all instances quote the testimony verbatim, but merely state in substance, with now and then comments as to its purpose. On pages 39 and 40 of the record, Mr. Horth in substance testifies that in answer to a question he told Mr. E. E. Mills that he, Horth, was bidding with the Cable Co. and that the next morning when the bids were opened Mr. Mills sat beside him. On page 47 plaintiff says that he received a telephone call from Mr. E. E. Mills on the 8th day of May from Massillon to his office in Cleveland soliciting business for the gravel which was included

in the contract which he had secured the day previous. On page 62 he testifies that on the evening of June 4, 1935, at Zanesville, Ohio, immediately previous to the letting of another contract for the relocation of the Pennsylvania Railroad Mr. Mills asked him several times when they could get together on the gravel for the B. & O. job.

On page 81 plaintiff testifies that Mr. Mills called him several times between May 8th and June 4th relative to the gravel contract and that on or about July 1st Mr. Mills called upon him at his office in Cleveland and again talked about securing the contract for the gravel. He again saw Mr. Mills on July 18th. He further testified that at no time did Mr. Mills say anything about the defendant company having entered into any contract with the Cable Co. On page 65 he says that he met Mr. Mills on September 18th at the Canton Traffic Club and had dinner together at that time, but nothing was said concerning the defendant company having a contract with the Cable Co. One page 101 a letter from Mr. Mills of plaintiff company, under date of May 2, 1935, was identified and introduced. This letter purports to be an answer to an inquiry from plaintiff for prices. The letter states that it inclosed the prices as per request.

No further testimony was given by Mr. Horth as to any other conversations with Mr. Mills or any other representative of the defendant company or any communications of any kind or character other than the above noted. As we understand, this evidence was presented for the purpose of proving that the defendant company through its officers or representatives had knowledge of the claimed contract between the plaintiff and the Cable Co.

On that issue it would have probative force, but standing alone would not be sufficient to sustain the controverted issue that the defendant company maliciously induced the Cable Co. to breach its contract with plaintiff.

At the close of plaintiff's direct testimony counsel for defendant declined to cross-examine, making the statement that he would reserve his right if necessary or desirable to cross-examine Mr. Mills when defendant presented its testimony.

As heretofore stated, plaintiff's second witness was Mr. Fred E. Coppock, President of the defendant company, who was called for cross-examination. The testimony of this witness in cross-examination consumes 27 pages of the typewritten record. Through the cross-examination of Mr. Coppock it was established that on June 6, 1935, the defendant company entered into a contract with the Cable Co. for the performance of certain parts of the Government contract, some items of which were the same as involved in the claimed contract between the plaintiff and the Cable Co.

The second contract was entered into on October 21, 1935, involving the same items as in the first, but at a reduced price, which Mr. Coppock testified was to take care of reduced freight rates which had been placed in operation. This witness was also interrogated as to the letter of July 13, heretofore referred to and admittedly received on the 15th by the defendant company. Two other letters were presented, identified, and admitted. One was dated October 15, 1935, from the plaintiff company to the defendant company, Greenville, Ohio, and in substance stated that plaintiff company was open for a proposition on items 18, 19, 20, 31 and 32 in their contract for the relocation of the Baltimore & Ohio Railroad, Beach City Reservoir. A second letter was written November 26, 1935. Mr. Coppock replied under date of December 9, 1935. Defendant's contracts were admitted in evidence as exhibits.

The cross-examination of Mr. Coppock made no direct inquiry on the factual question as to what, if anything was done by the witness or the defendant company to induce the Cable Company to breach its contract with the plaintiff, other than that the defendant company did enter into a contract with the Cable Company when it

had knowledge that the plaintiff had a contract for a portion of the same work.

At page 117 and 118 of the record, counsel for plaintiff in his cross-examination of Mr. Coppock made the inquiry of the witness as to whether or not at the time the defendant company entered into its contract with the Cable Company he had knowledge that the plaintiff company had or claimed to have a contract with the Cable Company for the same items. Witness Coppock replied that he knew they claimed they had, but he also understood that they did not have. This was the state of the record at the close of plaintiff's case when counsel for defendant interposed motion for a directed verdict.

The trial court having overruled the motion and defendant having elected to proceed with its evidence. it becomes necessary to inquire whether or not under the entire record there is a failure of evidence on any of the elements requisite to establish plaintiff's cause of action.

Defendant called as witnesses the following persons: Mr. D. B. Hamer, of Detroit, Michigan, a railroad contractor of 20 years experience, formerly affiliated with the defendant company, and who testified that he was present when the contract of June 6, 1935, between the Cable Company and the defendant company was entered into, and at that time Mr. Coppock made inquiry of the Cables whether or not they had made any other commitments which would prevent their contracting with the defendant company. The Cables, one or both, stated that they had not, and that immediately thereafter the memorandum contract was signed.

The second witness was Mr. E. E. Mills, who gave testimony as to his activities in his effort to sell gravel for ballast to anyone and everyone that might be interested.

In addition, this witness testified that he was also present at the meeting of June 6 and narrates the conversation between Mr. Coppock, President of the defendant company, and the Cables relative to any other commissions, (it is apparent that he used the words "commissions", instead of "commitments") and that the Cables said none.

The third witness was Mr. Homer H. Horth, the plaintiff, called for cross-examination. In the main, this cross-examination related to the matters concerning which plaintiff had testified in his examination in chief. Neither in his cross-examination nor in his re-direct was anything brought out relative to any action of the defendant company supporting the petition that the defendant maliciously induced the Cable Company to breach the contract with plaintiff, except the fact that the defendant company entered into a contract with the Cable Company with knowledge that the plaintiff had a contract for the same work.

This, of course, presents a legal question which we will discuss later.

The fourth witness was George F. Ainslie of Columbus, Ohio, a bondsman who apparently had been contacted and was probably present at the meeting of June 6th on the solicitation of Mr. Coppock. He also testified that Mr. Coppock inquired of the Cables as to other commitments and received the response —none.

The fifth witness was Austin B. Cable who at the time of trial was President of the Cable Company. The greater portion of his testimony was directed to the question as to whether or not there existed a contract between his company and the plaintiff. On this phase of the case we are not at this time concerned for the reason that the evidence presented a clear issue of fact, and the jury having returned a verdict in favor of the plaintiff, we would not disturb on the question as to whether or not there was an existing contract. This witness, however, does present evidence that there was a controversy and that his company on advice of counsel had refused to sign the supplemental contract which plaintiff and his counsel had presented to them at a meeting a week or two following May 7th when the bids were opened.

Mr. Cable also testified that on June 6, 1935, when the contract was signed

with the defendant company, Mr. Coppock made inquiry as to whether or not the Cable Company had any commitments which would prevent them executing the contract with the defendant company and that he answered, "Positively not."

The sixth witness called was Judge George H. Clark of Canton who was attorney for the Cable brothers at all times referred to. His testimony was directed exclusively to meetings held between the plaintiff and representatives of the Cable brothers in his office, the first of which was a week or two following May 7, and the last on or about July 29th. His testimony was directed entirely to the issue concerning which we have heretofore stated gives us no concern at this time.

The seventh and last witness was Fred Rowe, a contractor, who testified that prior to May 7th the plaintiff had given him prices on one or more of the schedules which were lower than the quotations made to the Cable Brothers. This testimony had no bearing upon the issue of malicious inducement.

Mr. Homer H. Horth was then called in rebuttal on his own behalf. His rebuttal testimony presented no new evidence on the issue of malicious inducement.

At the close of all the evidence, defendant again interposed motion for directed verdict which was overruled. After the return of the verdict by the jury in favor of the plaintiff, plaintiff interposed motion for judgment, notwithstanding the verdict, which was overruled. Motion for new trial was also interposed, overruled and judgment entered on the verdict.

We determine that the entire record presents no evidence on the issue of malicious inducement, other than evidence that defendant at the time it entered into its contract with the Cable Brothers on June 6, 1935, and later on October 21, 1935, had knowledge that the Cable Brothers had previously contracted with Horth for some of the same work. In arriving at this conclusion, we do not take into consideration any testimony presented by defendant

favorable to their side of the case for the reason that the jury may have disbelieved any or all witnesses for the defendants as they had a right to do. Our only purpose in calling attention to the testimony of the defense witnesses was to demonstrate that nothing was contained therein supporting the issue of malicious inducement.

When we later discuss the error assignment that the verdict was against the manifest weight of the evidence we then may properly consider the defense testimony. We now come to a discussion of the law as to what constitutes malicious inducement as it relates to the issues in the instant case. We are cited to the case of **Uihlein v The Cincinnati Car Co et, 34 Oh Ap 52**, opinion by Judge Cushing of the Hamilton County Court of Appeals. Syllabus 4 reads as follows:

"Persons not bound by contract are not liable for damages for its breach on ground that they aided or abetted party in its violation."

On page 58 of the opinion, this question is touched upon in a single paragraph, Vol. 13 Corpus Juris, 713, quoted from as follows:

"Further, persons not bound by contract are not liable for damages on its breach, although they have aided or abetted the party in its violation."

Also in the same volume at page 465 is found the case of Weinberg, etc. v Schaller. Again the opinion was by Judge Cushing. We find no helpful decisions from the Supreme Court of Ohio. In the two Ohio Appellate Reports, supra, the issue of malicious inducement was no more than incidental and was not the controlling factor upon which the ultimate decision was made.

By reason of the dearth of authorities in Ohio, we are moved to consider authorities and cases in other jurisdictions. In the restatement of the law of Torts adopted and promulgated by the American Law Institute, published May 13, 1939, under topic heading, "In-

ducing Breach of Contract or Refusal to Deal," Section 766, at page 59, under subheading "i" we find the following:

### "MAKING AGREEMENT WITH KNOWLEDGE OF THE BREACH.

"One does not induce another to commit a breach of contract with a third person under the rule stated in this Section when he merely enters into an agreement with the other with the knowledge that the other cannot perform both it and his contract with the third person * * *. For instance, B is under contract to sell certain goods to C. He offers to sell then to A who knows of the contract. A accepts the offer and receives the goods. A had not induced the breach and is not subject to liability under the rule stated in this Section."'

Subheading "h" on pages 58 and 59 is also in point to the same effect and in part reads as follows:

"A's freedom to conduct his business in the usual manner, to advertise his goods, to extol their qualities, to fix their prices and to sell them is not restricted by the fact that B has agreed to buy similar goods from C. Even though A knows B's contract with C, he may nevertheless send his regular advertising to B and may solicit business in normal course. Such conduct does not constitute inducement of breach of the contract."

In the case of Sweeney v Smith et, 167 Federal, 385, the syllabus reads as follows:

"The mere fact that a purchaser of bonds from a committee of bondholders authorized to sell the same at the time of the purchase had knowledge that the committee had previously contracted to sell them to another does not render him liable to such other in damages because of the sellers' breach of contract."

Pages 386, 387 and 388 of the opinion are elucidating and instructive. This case was carried to the Circuit Court of Appeals where the decision of the District Court was affirmed. See Vol. 171 Federal Reporter, page 645. Syllabus reads as follows:

"The mere fact that a purchaser of bonds from a committee of bondholders authorized to sell the same at the time of the purchase had knowledge that the committee had previously contracted to sell them to another does not impose upon him any liability to account to such other for any profit he may have made in the transaction, in the absence of any allegation or proof of fraud or that he induced a breach of the prior contract by the committee."

This case was attempted to be carried to the United States Supreme Court and the latter on October 18, 1909, denied a writ of certiorari, 215 U. S., page 600.

The Court of Appeals of Kentucky goes much further in denying liability than does any other decision to which our attention has been called. In the case of Chambers et v Baldwin (Ky.) 15 S. W., p. 57, the following syllabus appears:

"A party to a contract for the sale of goods cannot maintain an action against one who maliciously, and with design to injure him, and to benefit himself by becoming a purchaser in his stead, advises and procures the other party to break the contract."

The Supreme Court of the State of California closely approaches the rule of the Kentucky Court, supra. We refer to the case of Boyson v Thorn, 33 Pacific, page 492, which contains the following syllabus:

"An action will not lie against one who maliciously, but without threats, violence, fraud, falsehood, or benefit to himself, procures a breach of contract between others."

We have also examined the case of Schonwald et v Ragains, 122 Pacific (Okl.) page 203. Syllabus reads as follows:

"It is not unlawful for one, by fair means and lawful argument or persuasion, to interfere with the contractual relations of another, and without doubt one person has the legal right to persuade another to leave his employer's service, or to quit trading with another, provided always such persuasion and argument is fair, and not unlawful, and is made with the honest intent and purpose of fairly bettering one's own business, trade or employment, and not for the primary object of wrongfully destroying honest competition, or wrongfully injuring one's competitor."

A reading of the opinion in this case will be helpful. The Appellate Court of Illinois has taken a position very similar to the Kentucky Court, supra. In the case of Jackson v Morgan et, 94 North Eastern, page 1021, the syllabus reads as follows:

"For a third person to procure a party to a contract to breach it to the damage of the other party, though with malice, ill will, or intention to injure such other party, or to secure a benefit for himself, is not actionable, unless unlawful means, such as force, threats, or intimidation, are employed to procure the breach."

Counsel for plaintiff has referred us to Ruling Case Law, Vol. 15, under the heading "interference" at pages 54 and 60. We have examined the entire chapter, starting at page 41 and continuing to page 90, inclusive. Quoted excerpts from the text, very general in character, apparently support counsel for plaintiff's contention, but a careful analysis leaves us in a quandary as to the state of facts under which the principles are announced. Of course, the text in Ruling Case as in all other similar publications is made up exclusively from reported cases. These reported cases are always referred to in the notes. We have made an effort to examine all these cases as well as similar notes to citations from 84 A. L. R.

We have not been able to find a single case where a court has held that malicious inducement may be inferred from the mere fact that a third party enters into a contract with one of two contracting parties with knowledge that such party had previously contracted with another on the identical subject matter.

We are also referred to Vol. 84 A. L. R., pages 35, 43 and 51. It is a practice of A. L. R. to select a case upon which principles are announced and then follow under what is designated, "Annotations" the decisions of other courts, both in England and the United States, on the same questions. The case listed is that of Sorenson v Chevrolet Motor Company et, 214 North Western (Minn.) page 754. This was a decision by the Supreme Court of Minnesota and was presented on the question as to whether or not the petition stated a cause of action. The majority of the Court reversed the lower Court and held that a cause of action was stated. Stone, J., dissented from the majority opinion. The majority Court in its opinion dealt in generalities, and we find little if any help on the question as to whether or not the mere entering into a contract with knowledge of a previous contract constitutes malicious inducement. The same observation might be made when we examine the cases cited under the annotations. We adopt and follow the law as announced in the restatement of the Law of Torts, adopted and promulgated by the American Law Institute, page 59, under subheading "i" of Section 766.

On the factual question we find that there is a total absence of any evidence supporting plaintiff's petition on the issue of willful inducement, and for that reason we determine that ██ the trial court should have sustained defendant's motion to direct a verdict at the close of plaintiff's testimony, renewed at the close of all the testimony, and further should have sustained defendant's mo-

tion to enter final judgment, notwithstanding the verdict.

The remaining claimed errors become unimportant, unless perchance our judgment should be reversed in the Supreme Court. However, the statute requires the reviewing court to pass upon all errors, and we now do so with very brief comments.

## V.

"THE VERDICT AND JUDGMENT IN THE COMMON PLEAS COURT WERE AGAINST THE WEIGHT OF THE EVIDENCE AND CONTRARY TO LAW."

From what has previously been said, it necessarily follows, since we find that there was no evidence on a vital issue in the case, the verdict was against the manifest weight of the evidence.

## VI.

"SAID COURT ERRED IN ADMITTING EVIDENCE OFFERED BY PLAINTIFF AND OBJECTED TO BY DEFENDANT TO THE ADMISSION OF WHICH THE DEFENDANT AT THE TIME EXCEPTED."

This ground of error is not well founded.

The particular evidence objected to related to inquiries made tending to support the making of the contract between the plaintiff and the Cable Company. The claim was made that this evidence was inadmissible, because not occurring within the presence of the defendant.

One of the issues involved was whether or not such a contract had been made, and the evidence was properly admissible.

## VII.

"THE COURT ERRED IN EXCLUDING EVIDENCE OFFERED BY THE DEFENDANT TO THE EXCLUSION OF WHICH BY THE COURT THE DEFENDANT EXCEPTED"

Counsel for defendant in their brief called specific attention to the various questions and answers on which there was an adverse ruling by the Court. We find no error, except in one instance.

Starting at page 176, we find the following questions and answers with objections and rulings:

"Q. Now, Mr. Mills, between May 7th, 1935 and June 6th, 1935, did Mr. A. B. Cable of The Cable Company make any statement to you relative to Horth's claim to having a contract or subcontract on this job?

A. He did.

Q. And when was that statement made?

A. I can't say as to date, but I imagine as many as three or four times during that period.

Q. And what were those statements; what did he say?

A. That he did not consider that he had a,—

MR. CARTER: I object.

THE COURT: Just a moment, objection is overruled.

MR. CARTER: Exceptions.

A. That he did not consider he had a contract with Horth; that Horth would never do his track work; that if, —if he could—that he was going to sublet the track work to someone else. I had definite knowledge that he was dealing with three other track companies.

MR. CARTER: I object.

THE COURT: That may be stricken and the jury will be instructed to disregard it."

It is the claim of counsel for plaintiff that the Court only intended to strike from the answer the last part thereof.

This may be true, but we would not be able to so conclude from the record. It is correct that the last part of the answer was objectionable. The first part of the answer should be admitted.

The other questions and answers ruled out were properly sustained because of the form of the question or the nature of the answer. In some instances it really called for hearsay testimony.

## VIII.

"THE COURT ERRED IN REFUSING TO CHARGE THE JURY AS REQUESTED BY DEFENDANT."

## X.

"THE COURT ERRED AT THE TRIAL IN REFUSING TO GIVE TO THE JURY BEFORE ARGUMENTS SPECIAL INSTRUCTIONS NOS 6 AND 7 AS REQUESTED BY THE DEFENDANT."

As far as we are able to ascertain from the record, both No. 8 and 10 refer to the Court's refusal to give special instructions Nos. 6 and 7.

In our judgment, special request No. 6 was properly refused for the reason that it was abstract and too general. Special request No. 7 we think was properly refused for the reason that it would be misleading.

## IX.

"THE COURT ERRED AT THE TRIAL IN GIVING TO THE JURY BEFORE ARGUMENTS SPECIAL INSTRUCTIONS NOS. 1, 2 and 3 AS REQUESTED BY THE PLAINTIFF."

It is our conclusion that special instructions Nos. 1 and 2 were objectionable and should not have been given. We find no error in giving No. 3.

## XI.

"THE COURT ERRED IN ITS GENERAL CHARGE TO THE JURY."

We find nothing erroneous in the general charge of the Court. Coming now to judgment that should have been entered in the court below; judgment for defendant. Plaintiff's petition dismissed and costs adjudged against plaintiff.

HORNBECK, PJ & GEIGER, J., concur.

## ON APPLICATION FOR REHEARING

No. 565. Decided March 15, 1940.

BY THE COURT:

We have before us application for rehearing presented by counsel for appellee.

The original opinion is dated February 5, 1940, and the application March 5, 1940. It therefore appears that the application for rehearing is not filed within the time prescribed under Rule X of the General Rules of Practice adopted by the Court of Appeals of Ohio.

This rule provides that the application must be made within ten days after the decision was announced. Except in special cases, we follow this rule strictly. However, we have examined the specifications set forth in the application and find nothing therein that demands a rehearing. The record does not support appellee's claims on the facts.

The text of the application indicates to us that counsel have failed to understand the import of our decision. We would therefore recommend a rereading of our original opinion, which we think will answer all questions presented through the application.

The application for rehearing is overruled.

HORNBECK, PJ, GEIGER & BARNES, JJ., concur.