James PROVINCE, et al.,
Plaintiffs-Appellants,

v.

CLEVELAND PRESS PUBLISHING CO.;
Plain Dealer Publishing Co.; Joseph
Cole; Lakeside Associates, Defendants-
Appellees,

and

Cleveland Typographical Union No. 53,
Haven Combs, President, Third Party
Defendants-Appellees.

No. 85-3313.

United States Court of Appeals,
Sixth Circuit.

Argued Feb. 7, 1986.

Decided April 8, 1986.

Robert M. Phillips (argued), Stanley B. Wiener, Cleveland, Ohio, for plaintiffs-appellants.

Craig M. Brown, Duvin, Flinker & Cahn, Barbara Friedman Yaksic (argued), Baker & Hostetler, James P. Garner, Lawrence M. Oberdank, Cleveland, Ohio, Richard J. Urowsky (argued), Sullivan & Cromwell, New York City, for defendants-appellees.

Before KEITH and GUY, Circuit Judges, and TAYLOR, District Judge.*

* Honorable Anna Diggs Taylor, United States District Court, Eastern District of Michigan, sitting by designation.

GUY, Circuit Judge.

This case involves antitrust litigation growing out of the June 17, 1982 closing of the Cleveland Press newspaper (Press). Plaintiffs, 89 former employees of the Press, appeal from a summary judgment of the district court dismissing their complaints in two consolidated actions: *Province v. Cleveland Press Publishing Co.* and *Ridley v. Plain Dealer Publishing Co.*, 605 F.Supp. 945 (N.D.Ohio 1985).[1] As explained below, we affirm the decision of Judge Aldrich.

Plaintiffs lost their jobs when the Press ceased operations in 1982. Essentially, plaintiffs allege that the closing of the Press was the product of a conspiracy between the Press and the Cleveland Plain Dealer (Plain Dealer), the sole surviving daily paper in Cleveland.

The factual background of this case begins in 1972, when the Cleveland area was primarily served by two daily newspapers, the Press and the Plain Dealer. At that time, E.W. Scripps Company owned the Press, and Plain Dealer Publishing Company owned the Plain Dealer. On January 17, 1972, both Scripps and Plain Dealer Publishing Company, on a multi-employer basis, signed a Job Security Agreement (Agreement) with the Cleveland Typographical Union, Local No. 53 (CTU). Pursuant to the Agreement, Plain Dealer and Scripps each undertook to provide employment guarantees for its eligible typographical employees in exchange for the abandonment of certain duplicative work practices. The Agreement further provided that if either paper ceased publication, the employment guarantee was terminated with respect to that paper's employees. In that regard, paragraph 2 of the Agreement, as set forth in a Memorandum of Clarification which was made part of the Agreement, provides that:

[I]n the event the Publishers, or either of them, permanently cease publication that such employment guarantee will thereupon cease, and provided further, that during any period of temporary suspension of publication by the Publishers, or either of them, the job guarantee will be suspended for such period of temporary suspension of publication, with respect to the Publisher or Publishers who have ceased or suspended publication.

The portion of the Agreement guaranteeing life-time employment proved to be an economic burden for the employers, especially with the advent of automation. Therefore, on several occasions, the Plain Dealer and the CTU executed supplements to the Agreement providing for, among other things, a mandatory retirement age and cash incentive payments for CTU members who voluntarily relinquished their employment rights.

In 1978 and 1979, the last two years that Scripps published the Press, the newspaper incurred substantial operating losses. Thus, in 1980, Scripps announced that the Press would close unless a buyer could be found. In October, 1980, Press Publishing Company, a newly formed company of which Joseph Cole was the principal shareholder, agreed to purchase the Press. Press Publishing acquired the Press in exchange for $1 million in cash and a $7 million promissory note. At that time, Press Publishing Company also agreed to abide by the terms of the Agreement entered into by Scripps and the CTU.

Press Publishing Company formally commenced operations on October 31, 1980, and immediately introduced several format changes in an effort to increase profits. However, despite its efforts, the Press continued to lose money until twenty months later when the Press' operations ended. By late 1981, losses had increased to between $750,000 and $1 million each month.

**1.** *Province v. Cleveland Press Publishing Co.* was originally filed in federal court on the basis of federal jurisdiction. *Ridley v. Plain Dealer Publishing Co.* was originally filed in Ohio state court alleging tortious interference with contract. Subsequently, *Ridley* was removed from state court on the basis of federal jurisdiction under Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185. At that time, *Ridley* was consolidated with *Province* and the parties and the court agreed to treat the *Ridley* claim as a pendent state claim in *Province*.

Faced with these losses, Joseph Cole, publisher of the Press, arranged a meeting in December of 1980 with Samuel Newhouse, the chairman of the Plain Dealer's parent company. At the meeting, Cole suggested to Newhouse that perhaps the two papers would benefit from a joint operating agreement.[2] Newhouse indicated that he did not think that such an agreement would be in either party's best interests. One year later, Cole again raised the possibility of a joint operating agreement with Newhouse, and again the idea was rejected.

In other efforts to solve the newspaper's financial problems, the Press abandoned solicitation of potential subscribers, and assigned the task to a newly formed corporation, Del-Com, Inc. Del-Com was owned and operated by James Maloney, an associate of Cole. At approximately this same time, the Press commissioned Edward Padilla, a communications consultant, to find a potential buyer for the Press. In May of 1982, Padilla informed the Press that his efforts were unsuccessful.[3]

On March 19, 1982, Cole again met with Newhouse to discuss the idea of a joint operating agreement. Newhouse reiterated his lack of interest. Cole then advised Newhouse that he was considering closing the Press because of excessive losses, and asked Newhouse if the Plain Dealer would be interested in purchasing any assets in the event of a closure. Newhouse refused to discuss the possibility of purchasing any assets until Cole made a final decision on whether to continue publishing the paper.

Finally, on May 13, 1982, Cole met with Newhouse and explained that due to serious financial difficulties he had formally decided to close the newspaper. Cole again asked Newhouse if the Plain Dealer was interested in purchasing any Press assets.

Newhouse only expressed interest in the Press' subscription list. Cole wanted $20 million for the list, but accepted Newhouse's offer of $14.5 million. An agreement was drafted and signed on June 10, 1982. According to Newhouse and Cole, plaintiff's agreement with the CTU was never discussed during the negotiations leading to the purchase of the subscription list. In fact, Newhouse claims that he did not even have personal knowledge of the Agreement at that time.

At the time the Press closed, the Plain Dealer also received an option for $8 million to acquire Del-Com, Inc., in which the Press had no interest, but which was operated as a separate venture by Cole and Maloney. After the Press closed, Del-Com began performing a similar function for the Plain Dealer as it had for the Press, and also assumed responsibility for the Plain Dealer's subscription solicitation activities.

When the Press formally ceased operations in June of 1982, its obligations under the Agreement automatically ceased as well. As a result, plaintiffs lost their jobs. The obligations of the Plain Dealer to its employees, however, remained in full force and effect, and the Plain Dealer continues to honor the Agreement with respect to its own employees.

In February, 1983, plaintiffs filed the *Province* action in district court alleging violations of Sections 1 and 2 of the Sherman Act. 15 U.S.C. §§ 1 and 2. Plaintiffs also filed the *Ridley* action in state court alleging tortious interference with contract. In June of 1984, the *Ridley* action was removed to the district court and consolidated with *Province*. By stipulation, the parties agreed that the claim alleged in *Ridley* would be deemed an additional claim in the *Province* complaint asserted

---

**2.** A joint operating agreement is an agreement by two or more newspapers to publish jointly by consolidating some or all of their non-editorial functions. Joint operating agreements are authorized by the Newspaper Preservation Act of 1970, 15 U.S.C. § 1801 *et seq.*, subject to approval by the Attorney General.

**3.** Plaintiffs claim that the Press was aware that John Malone was a potential purchaser at the time of its closing.

pursuant to the principles of pendent jurisdiction.

Following discovery, plaintiffs moved for summary judgment on the merits of their antitrust claims, and defendants cross-moved to dismiss those claims for lack of standing. In addition, defendants moved to dismiss the tortious interference with contract claim on the merits. The district court granted defendants' motion for summary judgment, and dismissed plaintiffs' antitrust claims for lack of standing. The court also dismissed plaintiffs' claim for tortious interference with a contract, finding that "a jury ... could not on the present record properly find that [the Plain Dealer and Mr. Newhouse] specifically intended to interfere with plaintiff's Job Security Agreement." *Province v. Cleveland Press Publishing Co.*, 605 F.Supp. at 966. On appeal, plaintiffs challenge the dismissal of their antitrust claims and their pendent state law claim.[4]

## I.

■ Plaintiffs lost their employment when the Press ceased business, and the Press ceased business, according to plaintiffs, due to a conspiracy between the Press and the Plain Dealer to monopolize the Cleveland daily newspaper market. The issue here is whether plaintiffs have standing to sue for treble damages due to the alleged antitrust violations. Private parties are entitled to bring actions for violations of the antitrust laws under Section 4 of the Clayton Act, 15 U.S.C. § 15, which provides that:

> Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefore in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the

cost of suit, including a reasonable attorney's fee.

Despite the broad language of Section 4, the Supreme Court has recognized that "the judicial remedy cannot encompass every conceivable harm that can be traced to the alleged wrongdoing." *Associated General Contractors of California v. California State Council of Carpenters*, 459 U.S. 519, 537 103 S.Ct. 897, 908, 74 L.Ed.2d 723 (1983); *accord Southaven Land Co. v. Malone & Hyde, Inc.*, 715 F.2d 1079 (6th Cir. 1983) ("[A]pplication of § 4 has of necessity been judicially confined to limit the remedy available thereunder to particular classes of persons and for redress of particular forms of injury.").

In the *Province* action, plaintiffs specifically allege antitrust violations as a result of the Plain Dealer's purchase of the subscription list from the Press at a price well in excess of its true value. Paragraph 20 of the Complaint states that the defendants "conspired together for the purpose and with the intent of creating a monopoly in the product market of daily and Sunday newspapers for the Greater Cleveland area, and for the purpose of terminating the Job Security Agreement." Paragraph 21 further states that "the purpose of purchasing said assets and for paying such an excessive sum of money was to eliminate all major competition to the Plain Dealer's business in the Greater Cleveland area and to terminate the Job Security Agreement."

In *Southaven Land Co. v. Malone & Hyde, Inc.*, 715 F.2d 1079 (6th Cir.1983), this circuit reviewed the relevant Supreme Court authority, and expressly identified the following factors which must be considered in deciding whether a private party has standing to sue under Section 4:

(1) the causal connection between the antitrust violation and the harm to the plaintiff and whether that harm was intended to be caused;

(2) the nature of the plaintiff's alleged injury including the status of the

---

4. Plaintiffs do not appeal the district court's dismissal of their claims brought in the *Province* action pursuant to Section 301 of the Labor

Management Relations Act, 29 U.S.C. § 185, and found in counts I through III of their Complaint.

plaintiff as consumer or competitor in the relevant market;

(3) the directness or indirectness of the injury, and the related inquiry of whether the damages are speculative;

(4) the potential for duplicative recovery or complex apportionment of damages; and

(5) the existence of more direct victims of the alleged antitrust violation.

*Id.* at 1085.[5] No single factor is dispositive of the issue; rather, all factors must be carefully balanced.[6] We now review seriatim the five-pronged test of *Southaven* against the factual backdrop of this case.

A. *The Intent to Cause Harm and the Causal Connection Between The Antitrust Violation and the Harm to Plaintiffs*

Although plaintiffs allege that one purpose of the conspiracy between the Press and the Plain Dealer was to terminate the Agreement, they have failed to present any evidence to substantiate this allegation. The only accounts of the negotiations leading up to the purchase of the Press subscription list indicate that neither the Cleveland Typographical Union nor the Agreement were ever mentioned or considered. In fact, Mr. Newhouse, who conducted negotiations on behalf of the Plain Dealer, claims that he did not even have knowledge of the Agreement at that time. Therefore, judging solely from the negotiations, the requisite intent to cause harm was not present. Plaintiffs argue, however, that the intent is circumstantially evident from previous "conspiratorial attack[s]" upon the Agreement by the publishers. Plaintiffs reference the supplements to the Agreement which provided for a mandatory retirement age and cash incentives for employees who voluntarily relinquished their employment rights. The record is devoid of support for plaintiff's bald conclusion that these supplements were "attacks" upon the Agreement. Rather, they were supplements jointly agreed to by the union and management which tempered the economic hardship which the Agreement placed upon the publishers. The supplements were in both parties' best interest, for had they not been reached, the publishers might have been forced to cease operations, thus totally voiding the Agreement.

Plaintiffs also attempt to establish intent from what they perceive to be an ambiguity in the Agreement. Plaintiffs claim that by closing the Press considerable doubt was raised as to the continued obligations of the Plain Dealer with respect to its employees, and therefore the Plain Dealer gained bargaining leverage when the Press ceased publication. Plaintiffs' claim in this respect is purely speculative. There is no evidence showing that the Plain Dealer ever believed or alleged that its obligations under the Agreement did not continue in full force after the Press ceased publishing. Rather, the Plain Dealer has continued to honor the Agreement,

---

5. In *Southaven,* this court focused on the most recent Supreme Court decision on antitrust standing: *Associated General Contractors of California v. California State Council of Carpenters,* 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983), wherein the Supreme Court set forth the factors to consider with respect to antitrust standing, which factors were incorporated in *Southaven.*

6. Although the district court acknowledged this circuit's decision in *Southaven Land Co. v. Malone & Hyde, Inc.,* 715 F.2d 1079, 1084 (6th Cir.1983), and the factors set forth in that case, it did not then go through and discuss each of the factors and how each relates to the facts of this case. Instead, it appears, in part, that the district court applied a "target area" test for determining standing. *Province,* 605 F.Supp. at

962 ("employees only have standing to pursue this claim further if there are some facts which indicate that they were not merely injured by the alleged conspiracy but were its targets"). In *Southaven,* this court expressly rejected a "target area" test for determining Section 4 standing. *Southaven,* 715 F.2d at 1082. We stated that "henceforth [this circuit shall] implement the Supreme Court's directive to consider the § 4 inquiry on a case-by-case basis by applying the criteria mandated by *Associated General Contractors." Id.* at 1086. To the degree that the district court relied on a target area test, it was in error. However, since the right result was reached by the district court, we are nonetheless in a position to affirm. *Herm v. Stafford,* 663 F.2d 669, 684 (6th Cir.1981).

despite the fact that the Press quit publishing. Thus, the court cannot glean intent to abolish the Agreement from the actions of the Plain Dealer.

The court must also consider the causal connection between the alleged antitrust violation and the harm to plaintiffs. Here, since plaintiffs are unable to establish that terminating the Agreement was a purpose of the conspiracy, the only alleged antitrust violation left concerns creating a monopoly in the product market of daily newspapers in the Cleveland area. In a similar case, *Reibert v. Atlantic Richfield Co.*, 471 F.2d 727 (10th Cir.), *cert. denied*, 411 U.S. 938, 93 S.Ct. 1900, 36 L.Ed.2d 399 (1973), plaintiff was discharged due to an alleged illegal merger. With respect to the necessary causal connection, the court stated:

> If there has been a wrong, appellant cannot show that it results from the lessening of competition. Termination of employment will often occur whether the merger is legal or illegal. It is the natural effect flowing from two similarly structured businesses combining their assets to maximize their efficiency.

471 F.2d at 731.

Plaintiffs in the instant case are confronted with the same problem as the plaintiff in *Reibert*. Plaintiffs cannot show that their loss of employment resulted from the wrong which allegedly occurred: namely, the alleged monopolization of the daily newspaper market in Cleveland. At best, plaintiffs can attempt to show that the harm which occurred to them flowed incidentally from the Plain Dealer's purchase of the subscription list. Even there, the causal link is attenuated. The evidence is inconclusive as to whether the Press would have continued operations had the Plain Dealer not purchased the subscription list. Certainly, at the meeting between Cole and Newhouse, Cole told Newhouse that the Press had formally decided to cease publication. Plaintiffs point out, however, that there was still one potential purchaser of the Press, John Malone. Even accepting that Malone was interested in purchasing the Press, it remains unclear whether he would have purchased the Press subject to the Agreement. Thus, it is not even clear that plaintiff's harm flowed incidentally from the purchase of the subscription list. Plaintiffs may have lost their jobs regardless of the sale of the subscription list.

### B. The Nature of Plaintiffs' Injury Including the Status of Plaintiffs as Consumers or Competitors in the Relevant Market

With respect to this aspect of the *Southaven* analysis, it first must be noted that plaintiffs are not consumers or competitors in the relevant market, the relevant market being the daily newspaper market in the Greater Cleveland area. Plaintiffs' pleadings concede this point. However, a finding that plaintiffs were not direct participants in the relevant market does not automatically preclude Section 4 standing. The court in *Southaven* indicated that a plaintiff can also satisfy this aspect of the inquiry by showing that plaintiff's injury is "inextricably intertwined" with the injury sought to be inflicted on the relevant market. *Southaven*, 715 F.2d at 1086. To be inextricably intertwined with the injury to competition, the plaintiffs must have been "manipulated or utilized by [d]efendant as a fulcrum, conduit or market force to injure competitors or participants in the relevant product and geographical market." *Id.* An inextricably intertwined injury is one that results from the manipulation of the injured party as a means to carry out the restraint of trade in the product market.

Plaintiffs in this case were not manipulated in any way to cause the Press to cease publication; their injury was, at best, a result of—rather than a means to or cause of—the Press' demise. Consequently, plaintiffs' alleged injury, along with the possible injuries of newsprint suppliers and others who would have benefitted from continued publication of the Press, was a "tangential by-product" of the alleged conspiracy to restrain trade in the newspaper market. As such, it does not aid plaintiffs' claim of standing. 715 F.2d at 1086–87.

### C. *The Directness of the Injury and Whether Damages are Speculative*

The discussion above with respect to causation is relevant here in establishing that plaintiffs' damages were indirectly caused by the alleged wrongful conduct. In other words, the wrongful result which the publishers allegedly sought to attain was not the termination of plaintiffs' employment. Rather, plaintiffs' loss of employment was, at best, simply a byproduct of the publisher's alleged wrongful conduct. Moreover, plaintiffs' damages are highly speculative due to the economic difficulties of the Press in June of 1982. Much of the evidence indicates that the Press was doomed to cease publication even if the Plain Dealer had not purchased the subscription list. But, even assuming that the Press could have been sold and continued operations under new ownership, there is no evidence that the new owner would have assumed the Agreement in the form in which it existed. Plaintiffs' claims, therefore, require proof of the speculative proposition that the Press would have continued to operate on the same terms that caused it to sustain significant losses, or that such losses would simply abate without changes in production methods and manning levels. Since plaintiffs' injuries are indirect and speculative, this factor also weighs against granting plaintiffs standing.

### D. *Potential for Duplicative Recovery or Complex Apportionment of Damages*

Where the court finds that plaintiffs have only suffered an indirect injury as a result of the alleged antitrust violations, the danger of duplicative recovery is highly relevant. *Meyer Goldberg, Inc. v. Goldberg,* 717 F.2d 290, 294 (6th Cir.1983). For if the court were to allow all indirect victims standing to sue and potentially be awarded treble damages, the dangers of duplicative recovery and complex apportionment of damages would become very real. As this court noted in *Southaven,* "[p]articularly, indirect injuries may render damages highly speculative or create situations of complexity that would foreclose an equitable determination and apportionment of damages." *Southaven,* 715 F.2d at 1087. Here, plaintiffs have suffered, at best, an indirect injury, and therefore the examination of this part of the *Southaven* analysis also weighs against a finding that plaintiffs have standing to sue.

### E. *The Existence of More Direct Victims*

The court must finally consider whether there are more direct victims of the alleged antitrust violation who, motivated by the prospect of treble damages, might seek "to vindicate the public interest in antitrust enforcement." *Associated General Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 542, 103 S.Ct. 897, 910, 74 L.Ed.2d 723 (1983). The purpose of this inquiry is basically to ensure that a significant antitrust violation will not go undetected or unremedied. *Id.*

In this case, consumers, participants, and competitors in the relevant market would all be more direct victims. Each of these parties would be directly injured by a lessening of competition in the daily newspaper market. Plaintiffs argue, however, that none of these parties will be able to vindicate the public interest in this case. Plaintiffs point out that the Press was the only major competitor of the Plain Dealer, and thus, since the Press closed, there are no longer any direct competitors who are able to sue. In addition, plaintiffs note that in class actions that were brought on behalf of advertisers and subscribers with respect to this incident, the district court refused to certify the classes. Thus, plaintiffs conclude that there are not any directly injured parties who are able to vindicate the public interest here.

The court is unconvinced that there are no more direct victims available to prosecute this action. While it may be true that the Press was the only other *major* paper in the Cleveland area, there are still other competing newspapers in the Cleveland market, and the prospect of treble damages should be sufficient to motivate them to vindicate any antitrust violations which

they perceive. Thus, the court finds that an analysis of this aspect of the *Southaven* test militates against granting plaintiffs standing.[7]

This court thus concludes, having considered all of the pertinent factors set forth by this circuit in *Southaven,* that plaintiffs are not proper parties to pursue this action under Section 4 of the Clayton Act.

## II.

Plaintiffs also appeal the decision of the district court dismissing their tortious interference with contract claim on the merits. Plaintiffs present a dual argument. Plaintiffs first argue that the district court had no discretion to decide the pendent state law issue once the basis for federal jurisdiction (the antitrust claims) was dismissed. Relatedly, plaintiffs argue that if the court did have the discretion to decide a pendent state law claim, it abused the discretion in this case. Second, plaintiffs contend that, even if the court did not abuse its discretion in deciding the state law claim, summary judgment was improper due to material issues of fact which still existed with respect to that claim.

A. *District Court's Discretion to Hear Pendent State Law Claim Once the Federal Basis for Jurisdiction is Dismissed*

■ In *United Mine Workers v. Gibb,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218

(1966), the United States Supreme Court noted that the theoretical basis for pendent jurisdiction:

lies in considerations of judicial economy, convenience and fairness to litigants; if these are not present a federal court should hesitate to exercise jurisdiction over state claims, even though bound to apply state law to them. Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law. Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state law claims should be dismissed as well.

383 U.S. at 726, 86 S.Ct. at 1139 (footnotes and citation omitted).[8]

Subsequently, in *Rosado v. Wyman,* 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970), the Supreme Court further articulated the relevant policy considerations with respect to deciding pendent state claims once the basis for federal jurisdiction is dismissed. The Court stated:

We are not willing to defeat the common-sense policy of pendent jurisdiction—the conservation of judicial energy and the avoidance of multiplicity of litigation—by a conceptual approach that would require jurisdiction over the primary claim at all stages as a prerequisite to resolution of the pendent claim.

---

7. Even if this court was to find, as plaintiffs contend, that there are no direct parties who are willing and able to bring this suit, it does not follow that this court should grant standing to a party who has only been indirectly injured. As the district court aptly noted, "a consequence of these necessary [standing] limitations is that not every wrong relating to an antitrust violation can be undone by a private action under the Clayton Act. For this reason, the antitrust statutes provide that in appropriate cases the Department of Justice will vindicate the public interest by commencing a civil or criminal antitrust action." *Province,* 605 F.Supp. at 976. The existence of more direct victims is only a single factor to consider in the *Southaven* analysis, and by no means determinative.

8. In *United Mine Workers,* the Court set forth a four-part test for determining whether pendent jurisdiction is appropriate: (1) there must be a federal claim; (2) the relationship between the federal claim and the state claim must be such that it permits the conclusion that the entire action comprises but one case; (3) the federal claim must have sufficient substance to confer subject matter jurisdiction; and (4) the federal and state claims must derive from a common nucleus of operative fact. 383 U.S. at 725, 86 S.Ct. at 1138. In this case, there is no argument that a finding of pendent jurisdiction was originally proper. The only issue is whether the pendent state claim could still be decided once the admittedly "substantial" federal claim was dismissed for a lack of standing.

397 U.S. at 405, 90 S.Ct. at 1214.[9]

■ Reading *United Mine Workers* and *Rosado* together, it is apparent that trial courts do possess some discretion to decide a pendent state law claim once the federal basis for jurisdiction is dismissed.[10] A trial court must balance the interests in avoiding needless state law decisions discussed in *United Mine Workers* against the "commonsense" policies of judicial economy discussed in *Rosado*, when deciding whether to resolve a pendent state claim on the merits.

Through a series of cases following *United Mine Workers*, this circuit has adopted the position that the district courts have minimal discretion to decide pendent state law claims on the merits once the basis for federal jurisdiction is dismissed before trial. *See Service, Hospital, Nursing Home and Public Employees Union v. Commercial Property Services*, 755 F.2d 499, 506 n. 9 (6th Cir.1985) ("this circuit has moved away from the position that the court has discretion to retain jurisdiction over a pendent state claim where the federal claim has been dismissed before trial."). However, in certain cases, the overwhelming interests in judicial economy may still allow a district court to properly exercise its discretion and decide a pendent state law claim once the federal claim is dismissed before trial.

In this case, there was substantial similarity between the predicate factual findings necessary to the resolution of both the federal and state law claims. As a necessary step in deciding whether the plaintiffs had standing to pursue their antitrust claims, the district court was required to find whether defendants had the intent to interfere with plaintiffs' Job Security Agreement. Likewise, intent to interfere is a necessary finding in resolving a tortious interference with contract claim. This being the case, since discovery had closed and a substantial amount of time and resources had already been expended, we cannot find that the district court abused its limited discretion in deciding the pendent state claim on the merits. Although some marginal benefit may have been achieved had the district court decided to allow an Ohio court to decide the state law claim,[11] that benefit is substantially outweighed by the commonsense policies of judicial economy. Therefore, we find that the district court's resolution of this issue in favor of jurisdiction was not an abuse of discretion.[12]

**9.** In *Rosado*, the Court held that the district court had discretion whether to proceed with joined claims which lacked independent federal jurisdiction after the federal claim was dismissed for mootness. Although the pendent claim in *Rosado* was actually a federal claim which only failed achieving federal question jurisdiction because of the pre-1980 $10,000 amount in controversy requirement, the commonsense policy mentioned by the Court is equally relevant to pendent state law claims.

**10.** This assumes that the federal claim was originally substantial enough to confer federal jurisdiction. If, however, a federal claim is dismissed as being frivolous or patently meritless, then subject matter jurisdiction was never appropriate, and the pendent state claims must be dismissed without prejudice. *Dunton v. County of Suffolk*, 729 F.2d 903, 910–11 (2nd Cir.1984). In this case, although the trial court ultimately dismissed all of plaintiffs' federal claims, they were not "obviously without merit." Thus, federal subject matter jurisdiction was appropriate. *Levering & Garrigues Co. v. Morrin*, 289 U.S. 103, 105, 53 S.Ct. 549, 550, 77 L.Ed. 1062 (1933). *See generally* Annot., 75 A.L.R.Fed. 600 (1985).

**11.** Since the district court was not called upon to interpret some abstruse Ohio legal doctrine, the benefit of having a state court decide this case is not as substantial as it might be in other cases. The primary dispute between the parties turned on facts, not law.

**12.** Defendants also argue that the tortious interference with contract claim was appropriately before the district court on the basis of § 301 of the Labor Management Relations Act, 29 U.S.C. § 185. Thus, the claim had an independent source of jurisdiction, and should not have been considered merely a pendent state claim. Defendants point out that plaintiffs, in fact, removed this claim from state court on the basis of § 301 jurisdiction, and the removal went unchallenged. However, since the parties argued the claim on the basis of state law, the district court decided the claim on the basis of the state law, and we find no error in the district court's handling of the claim as a pendent state law claim, we refrain from addressing the issue of whether the tortious interference with contract claim independently invoked federal jurisdiction because it involved a collec-

### B. *The Propriety of Summary Judgment With Respect to the Pendent State Law Claim*

Having found that the district court properly exercised its discretion in deciding the pendent state law claim, the court must now decide whether the district court properly granted summary judgment to the defendants with respect to the tortious interference with contract claim. The district court granted summary judgment in favor of defendants because "a jury ... could not on the present record find that the two defendants [the Plain Dealer and Newhouse] specifically intended to interfere with plaintiffs' Job Security Agreement." *Province*, 605 F.Supp. at 966. We agree.

Although malice in the sense of personal ill will, spite, or hatred is not an essential element of a tortious interference with a contract claim under Ohio law, *Reichman v. Drake*, 89 Ohio App. 222, 100 N.E.2d 533, 537 (1951), it is also true that the tort is not to be "inferred from the mere fact that a third party enters into a contract with one of two existing contracting parties with knowledge" of the existing contract. *Heheman v. E.W. Scripps Co.*, 661 F.2d 1115, 1125 (6th Cir.1981), *cert. denied*, 456 U.S. 991, 102 S.Ct. 2272, 73 L.Ed.2d 1286 (1982) (interpreting Ohio law and quoting *Horth v. American Aggregates Corp.*, 35 N.E.2d 592, 599 (Ohio App.1940)). Plaintiffs have presented no direct evidence that Newhouse knew of the Agreement when he negotiated the subscription list purchase, much less that he intended to interfere with it. Both Newhouse and Cole claim that neither the Agreement nor the CTU was ever discussed during negotiations. Moreover, plaintiffs have presented no circumstantial evidence from which a reasonable person could impute to Plain Dealer a desire or motive to bring about the Agreement's termination with respect to Press employees.[13] Thus, there being no disputed issue of material fact, the district court's judgment dismissing the tortious interference claim is affirmed.

---

tive bargaining agreement. *See Service, Hospital*, 755 F.2d at 506.

**13.** Again plaintiffs ask this court to impute intent from defendants' previous "attacks" upon the Agreement. We are unable to impute an intent to interfere merely because the parties supplemented the Agreement from time to time in order to survive a changing economic climate.