File Name: 09a0206n.06
Filed: March 18, 2009
NOT RECOMMENDED FOR FULL-TEXT PUBLICATION

Nos. 07-4546/07-4548

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| GEORGE DAVID FOSSYL, Individually and as Administrator of the Estate of CHERYL FOSSYL, et al., | ) ) ) ) | |
| Plaintiffs-Appellees, | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO |
| v. | ) ) | |
| MICHAEL R. MILLIGAN and THOMAS A. WATSON, | ) ) ) | |
| Defendants-Appellants. | ) | |

Before: GIBBONS and WHITE, Circuit Judges; TARNOW, District Judge.[*]

**JULIA SMITH GIBBONS, Circuit Judge.** Defendants-appellants Michael R. Milligan[1]

and Thomas A. Watson appeal several jurisdictional and evidentiary rulings of the district court in

this civil rights and wrongful death action brought by plaintiffs-appellees George David Fossyl

---

[*]The Honorable Arthur J. Tarnow, United States District Judge for the Eastern District of Michigan, sitting by designation.

[1]On September 30, 2008, a Suggestion of Death Notice was filed with the Court indicating that Milligan died on or about September 18, 2008. At oral argument on December 3, 2008, the parties were notified that the Court intends to utilize Federal Rule of Civil Procedure 25(a), pursuant to which the decedent's successor or representative or any party may move for a substitution of parties within ninety days after service of the Suggestion of Death Notice. Since no motion for substitution was received by the Court during this time period, the court *sua sponte* dismisses Milligan's appeal.

1

(individually and as the Administrator of the Estate of Cheryl Fossyl), Tonia Harris, and Martin Fossyl stemming from the murder of a sixteen-year-old girl, Cheryl Fossyl, in 1977. A jury trial in the civil action resulted in a verdict for the plaintiffs totaling $707,000 in compensatory and punitive damages on their wrongful death, spoliation of evidence, civil conspiracy, and intentional infliction of emotional distress claims, as well as an award of attorneys' fees to the plaintiffs. Because the district court did not abuse its discretion, we affirm in all respects.

## I.

The parties stipulated to the following facts. Cheryl Fossyl was last seen alive on or about June 4, 1977. She was decapitated, and her head was recovered in Straight Creek in Brown County, Ohio on June 11, 1977. Her torso was recovered in Adams County, Ohio on June 28, 1977, but several portions of her remains including several vertebrae, her left clavicle, several ribs, and other portions of her skeleton were never recovered. No one was ever charged with Fossyl's murder. Dwayne Wenninger was elected Sheriff of Brown County in November 2000 and subsequently reopened the murder investigation.

On or about February 6, 2001, defendant-appellant Thomas Watson submitted to a polygraph test conducted by former Cincinnati police officer William Lewis in Cincinnati, Ohio. Sergeant John Schadle and Captain Barry Creighton accompanied Watson to Cincinnati for the polygraph test. The parties stipulated that the results of the polygraph test were inadmissible, but that statements made by Watson before and after the test were admissible in this case.

The parties dispute the content of the statements made by Watson before and after the polygraph test. According to Schadle's testimony, Watson first said that he did not know anything

about the crime but subsequently admitted that he had been at Straight Creek partying with Fossyl, Michael R. Milligan, Jean Ann Chinn, and Susan Davis. Watson stated that Fossyl was alive when Chinn and Davis left the scene to urinate at the creek, but that when the two girls returned, Fossyl was dead. When Schadle asked Watson whether he killed Fossyl, he began crying uncontrollably and stated that he did not remember. He said this would ruin his life, asked how he would explain this to his family, and asked for a "deal." Creighton called Brown County Prosecutor Tom Grennan who stated that he would not offer Watson a deal, and after Creighton informed Watson that there would be no deal, Watson refused to speak further. In their briefs, Watson and Milligan cast doubt on the memories of Lewis, Schadle, and Creighton regarding Watson's statement after the polygraph examination but do not offer any specifics about what Watson said on that day.

The statute of limitations for certain potential criminal charges related to Fossyl's death had already run by 2001, including the six-year statute of limitations for manslaughter. *See* Ohio Rev. Code ("ORC") § 2901.13(A)(1)(a). However, there is no statute of limitations for murder in Ohio. *See* ORC § 2901.13(A)(2). A grand jury was convened to hear evidence relating to Fossyl's death for six days in the summer of 2002. At the end of its six-day session, the grand jury returned no true bills.

This lawsuit was filed by Fossyl's estate administrator and next of kin on October 8, 2002, against Watson, Milligan, and Nick Tsanges,[2] as well as Brown County and various Brown County employees (collectively, the "government defendants"). The suit alleges claims under 42 U.S.C. § 1983 for equal protection and due process violations as well as conspiracy to destroy evidence by

---

[2]Tsanges died of a drug overdose on March 14, 2003, and was dismissed from this case.

the government defendants. The suit also alleges state law claims against Watson, Milligan, and Tsanges for wrongful death, spoliation of evidence, gross abuse of a corpse, conspiracy, and intentional infliction of emotional distress.

On October 17, 2007, the district court issued an order that the court had been notified of a settlement of all of the federal claims between the plaintiffs and the government defendants. The court indicated that the remaining defendants Watson and Milligan intended to file a motion to remand the remaining state law claims to state court, which they did in fact file on October 22, 2007. The court noted that it had discretion to remand the state law claims or to exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367(c). The court concluded that the exercise of supplemental jurisdiction was appropriate given that the matter had been pending for five years and that the trial date was scheduled for two weeks later; the trial court had dealt with this matter for three years and was "intimately familiar" with the issues involved; and a remand to state court would delay the resolution of the claims. Accordingly, the parties prepared for trial in the district court.

The plaintiffs filed a motion *in limine* on October 26, 2007, seeking to bar the testimony of defense witnesses Herman Pohlable and Jan Staubach as inadmissible hearsay. On October 29, 2007, Watson submitted a motion *in limine* to exclude certain testimony and evidence from trial. Watson sought to bar: (1) speculation about the cause of Fossyl's death because the lack of personal knowledge bars a lay witness from testifying according to Federal Rule of Evidence ("FRE") 602; (2) all hearsay testimony regarding the manner of Fossyl's death; (3) evidence regarding the death of Monroe Hines and the conviction of Ralph Moore for that murder; (4) the statement of Darrin Chinn to the Brown County Sheriff's Office regarding information given to him by his dying sister,

Jean Ann Chinn; (5) evidence relating to the polygraph examination given to Watson; and (6) evidence regarding plaintiffs' settlement with the government defendants.

The district court issued an opinion and order on November 1, 2007, ruling on the various motions that were before the court. The court denied Watson's motion to bar speculation about the cause and manner of Fossyl's death (issues one, two, and four above), allowing Mr. Chinn to testify as to his sister Ms. Chinn's statement to him about Fossyl's murder approximately three months before her death from cancer in August 2005. The court held that the statement was not admissible as a dying declaration because it did not concern the cause or circumstances of Ms. Chinn's impending death but found that it was admissible pursuant to FRE 804(b)(3) as a statement against interest because it subjected Ms. Chinn to criminal liability by placing herself at the scene of the murder and failing to report information to the authorities. It also ruled that even if FRE 804(b)(3) did not apply, the statement would still be admissible pursuant to FRE 807, the residual hearsay exception. The statement met the requirements of FRE 807 because:

> Ms. Chinn's statement is offered to prove the material fact of who killed Cheryl Fossyl and how. Further, Ms. Chinn's statement is more probative on this point than other evidence which Plaintiffs can procure since she is the only eye witness to the death who tells a complete story. Finally, the general purposes of the rules and the interest of justice are served by admission of the statement because Ms. Chinn was seriously ill and facing her own mortality and thus, there are other indicia of trustworthiness associated with the statement.

*Fossyl v. Watson*, No. 1:02cv722, slip op. at 6-7 (S.D. Ohio Nov. 1, 2007) ("*Fossyl I*").

Next, the district court addressed whether evidence of who killed Hines could be admitted (issue three above). The court noted that the plaintiffs indicated they no longer intended to introduce evidence that Tsanges may have killed Hines, even though Moore was convicted of Hines's murder.

5

The district therefore granted Watson's motion to bar testimony regarding Hines's death, and that ruling has not been appealed.

The fifth issue Watson raised in his motion was his attempt to bar evidence relating to the polygraph examination that had been administered to him. Ohio law holds that polygraph results are not generally admissible absent a joint stipulation, *State v. Dunlap*, 2007-Ohio-1624, at 7 (Ohio Ct. App.), and the plaintiffs conceded that the results of this polygraph could not be introduced into evidence to prove the truth of the matter. Watson also contended that statements made before and after the polygraph examination could not be introduced into evidence at trial, but the court rejected this position, considering both whether the proferred evidence was relevant and if so, whether the probative value of the evidence outweighed the hazard of unfair prejudice or potential confusion to the jury:

> Upon consideration, the Court concludes the fact Defendant Watson voluntarily submitted to a polygraph, his statements made before and after the polygraph, and the procedures Mr. Lewis used to interview Defendant Watson should all be admitted as they are relevant and the hazard of unfair prejudice and/or confusion would mislead the jury. Without the jury knowing that Defendant Watson submitted to the polygraph, the circumstances surrounding the alleged statements which are attributed to him by Messrs. Lewis, Schadle and Creighton may appear as if he was being railroaded by law enforcement authorities, when there is no evidence to support this. First, as stated, he voluntarily submitted to the circumstances which resulted in the alleged statements. Moreover, Mr. Lewis is not associated with Messrs. Schadle and Creighton, Instead, [sic] he is a third-party to the investigation.

*Fossyl I*, slip op. at 10.

The court granted plaintiffs' motion barring the testimony of Pohlable and Staubach as inadmissible hearsay. The court found that Pohlable's first-hand knowledge of the case was limited to what Fossyl's alleged killer told him. This alleged killer was identified as "a dope dealer living

in Mexico at the time of Cheryl's murder," but there was no corroborating evidence or indicia of trustworthiness regarding this testimony. Indeed, Pohlable did not identify the killer's name, address, or location; did not explain his relation to the killer; and did not explain why the killer would confess this murder to him. Staubach would have testified that she did not know who killed Fossyl but that she believed Eugene Gall to be the prime suspect based on her research. The court barred Staubach's testimony since she was a lay witness who did not meet the requirements of FRE 701 in that she was not offering information rationally based on her own perceptions, nor did she have contact with anyone who had a direct link to the case.

During the first trial, Lewis stated upon cross-examination that Watson failed the polygraph test. Defense counsel immediately moved for a mistrial, which the court granted after the court reporter overheard one juror remarking to another about the failed polygraph test, "See, I told you so." The second jury heard the case in full and returned a verdict in favor of the plaintiffs on all counts, awarding $707,000 in compensatory and punitive damages and awarding attorneys' fees to the plaintiffs. Watson and Milligan timely appealed.

## II.

Watson argues on appeal that the district court should have declined to exercise supplemental jurisdiction over the remaining state law claims after the federal claims had been settled. This court reviews a district court's determination of whether to exercise supplemental jurisdiction for abuse of discretion. *See Novak v. MetroHealth Med. Ctr.*, 503 F.3d 572, 583 (6th Cir. 2007).

## A.

Section 1367(a) of Title 28 of the United States Code gives the federal district courts

"supplemental jurisdiction over all other claims that are so related to claims in the action within [the court's] original jurisdiction that they form part of the same case or controversy." Section 1367 provides further that a district court "may decline to exercise supplemental jurisdiction" if "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). The district court should consider such factors as comity, judicial economy, convenience, and fairness in deciding whether to exercise jurisdiction over pendent state law claims, as well as the avoidance of unnecessarily deciding state law. *Pinney Dock & Transp. Co. v. Penn Cent. Corp.*, 196 F.3d 617, 620-21 (6th Cir. 1999). If the "balance of these factors indicates that a case properly belongs in state court, as when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988) (footnote omitted). However, this is not "a mandatory rule to be applied inflexibly in all cases." *Id.* at 350 n.7.

In this case, the district court did not err in continuing to exercise supplemental jurisdiction over the state law claims. The case had been pending for five years, and trial was scheduled to begin two weeks after the federal claims were settled. The district court had been in charge of the case for three years and was therefore familiar with all of the issues, and a remand would have delayed resolution of the claims. We find additional support for the district court's decision to exercise supplemental jurisdiction in *Province v. Cleveland Press Publishing Co.*, 787 F.2d 1047, 1055 (6th Cir. 1986). In that case, discovery had been completed and a "substantial amount of time and resources had already been expended" before the federal claims were dismissed prior to trial. *Id*.

The panel thus found that the district court did not abuse its discretion in continuing to exercise jurisdiction over the pendent state law claims because "[a]lthough some marginal benefit may have been achieved had the district court decided to allow an Ohio court to decide the state law claim, that benefit is substantially outweighed by the commonsense policies of judicial economy." *Id.* (footnote omitted). Likewise in this case, the principles of judicial economy, convenience, and fairness point strongly toward the district court's retaining jurisdiction over the state law claims.

The district court properly considered the relevant factors, concluding that the factors of judicial economy, convenience and fairness all pointed toward its retention of the state law claims. Though the district court did not explicitly address comity concerns, its analysis of the other factors provides compelling support for its decision to exercise supplemental jurisdiction over the state law claims since the "parties are entitled to the resolution of these claims sooner as opposed to later." *See Harper v. AutoAlliance Int'l, Inc.*, 392 F.3d 195, 211 (6th Cir. 2004) (affirming district court's exercise of pendent jurisdiction over state law claims where case was eleven months old, district court was familiar with facts of case, and court had invested significant time in discovery and pre-trial motions); *Taylor v. First of Am. Bank-Wayne*, 973 F.2d 1284, 1287-88 (6th Cir. 1992) (stating judicial economy and fairness supported the district court's retention of state law claims and affirming where the case had been on the docket for almost two years, parties had completed discovery, and case was ripe for a summary judgment ruling); *Aschinger v. Columbus Showcase Co.*, 934 F.2d 1402, 1412-13 (6th Cir. 1991) (citing judicial economy in affirming district court's exercise of pendent jurisdiction over state law claims where "discovery had been closed and a substantial amount of time and resources had already been expended").

B.

Watson further argues that supplemental jurisdiction should have been declined because the case presents novel or unresolved issues of state law regarding whether the discovery rule, which tolls the statute of limitations, applies to claims for spoliation of evidence, gross abuse of a corpse, civil conspiracy, and intentional infliction of emotional distress. *See Seabrook v. Jacobson*, 153 F.3d 70, 72-74 (2d Cir. 1998) (finding that district court should have declined to exercise supplemental jurisdiction where state law claim presented novel question of New York law and implicated "state's interest in the administration of its government"). Watson and Milligan presented this argument to the district court in their motion for remand, which was filed after the court announced its intention to continue to retain jurisdiction over the state law claims. Plaintiffs responded to the motion, arguing that the statute of limitations issues were not novel. The district court denied defendants' motion for remand, stating that its review of defendants' motion did not alter its earlier inclination to continue to exercise jurisdiction over the state law claims.[3]

---

[3]The order stated:

Before the Court is the October 23, 2007 Motion of Defendants Thomas Watson and Michael Milligan for Remand (Doc. 170). Plaintiffs filed a Memorandum in Opposition on October 23, 2007 (Doc. 171).

On October 17, 2007, the Court put on an order informing the parties that it intended to continue to exercise supplemental jurisdiction with respect to the remaining state law claims. A review of Defendants [sic] motion does not alter this conclusion.

10

Because the murder occurred in 1977, the causes of action are time barred[4] unless Ohio's "discovery rule" tolled the statutes of limitations. *See Investors REIT One v. Jacobs*, 546 N.E.2d 206, 209 (Ohio 1989). Watson concedes that the discovery rule applies to the wrongful death cause of action, *see Collins v. Sotka*, 692 N.E.2d 581, 585 (Ohio 1998), but argues that whether the discovery rule applies to the other causes of action presents novel and undecided issues of state law.

Although the Ohio Supreme Court has not specifically addressed the application of the discovery rule to claims for spoliation of evidence, gross abuse of a corpse, civil conspiracy, and intentional infliction of emotional distress, it has applied the rule to torts in varied situations including medical malpractice, fraud, adoption, legal malpractice, negligent exposure to toxic gas, sexual abuse, and asbestos removal. *See Collins*, 692 N.E.2d at 583-84 (collecting cases). *Collins* itself was a case in which a seventeen-year-old girl was murdered and the estate's administrator filed a wrongful death action more than two years after the murder took place but less than two years after the defendant was convicted. The Ohio Supreme Court found that the discovery rule applies when "'the application of the general rule that a cause of action exists from the time the negligent act was committed would lead to the unconscionable result that the injured party's right to recovery can be barred by the statute of limitations before he is even aware of its existence.'" *Id.* at 509-10 (quoting *Oliver v. Kaiser Cmty. Health Found.*, 449 N.E.2d 438, 440 (Ohio 1983)).

We conclude that the Ohio Supreme Court's decisions provide sufficient guidance and insight to enable the district court to decide the issues presented here without offending Ohio's interest in the administration of its laws. Even if there was some "marginal benefit" in allowing the

---

[4]Wrongful death has a two-year statute of limitations in Ohio and the other tort claims have a four-year statute of limitations. *See* ORC § 2125.02(D)(1); ORC § 2305.09.

11

Ohio courts to rule on these issues, such a benefit would have been substantially outweighed by the policy of judicial economy and fairness. *See Province*, 787 F.2d at 1055.

C.

Watson also argues that the district court abused its discretion by overruling his remand request without affording him the opportunity to speak in support of the request. This argument lacks merit because the district court did not overrule the substantive motion before it was submitted. The district court issued an order on October 17, 2007, noting that the federal claims had been settled and that the defendants intended to file a motion to remand. The court put the parties on notice that it intended to exercise supplemental jurisdiction in this matter so "the parties are to prepare this matter for trial as currently set." *Fossyl v. Watson*, No. 1:02cv722 (S.D. Ohio Oct. 17, 2007) (order informing the parties that the court will continue to exercise supplemental jurisdiction). Watson and Milligan filed a joint motion for remand on October 22, 2007, and the plaintiffs filed a motion in opposition on October 23, 2007. The district court issued another order noting that it had received the memoranda and at that point struck Watson's and Milligan's motion for remand, stating that "[o]n October 17, 2007, the Court put on an order informing the parties that it intended to continue to exercise supplemental jurisdiction with respect to the remaining state law claims. A review of Defendants motion does not alter this conclusion." *Fossyl v. Watson*, No. 1:02cv722 (S.D. Ohio Oct. 24, 2007) (order striking defendants' motion to remand). The court did not deny the motion for remand before receiving it but merely put the parties on notice that it intended to retain supplemental jurisdiction, and there is no evidence that the court failed to consider Watson's and Milligan's arguments once the briefs were submitted. Indeed, the district court explicitly stated that it

conducted a "review of Defendants motion" but that this review did not alter its conclusion that supplemental jurisdiction was appropriate. *Id.* The district court did not abuse its discretion in exercising supplemental jurisdiction over the state law claims once the federal claims were settled since this outcome provided convenience, fairness, and conserved scarce judicial resources.

III.

"'In reviewing a trial court's evidentiary determinations, this court reviews de novo the court's conclusions of law, e.g., the decision that certain evidence constitutes hearsay, and reviews for clear error the court's factual determinations that underpin its legal conclusions.'" *United States v. McDaniel*, 398 F.3d 540, 544 (6th Cir. 2005) (quoting *United States v. Reed*, 167 F.3d 984, 987 (6th Cir. 1999)). This standard offers consistency with the Supreme Court's statement in *General Electric Co. v. Joiner*, 522 U.S. 136, 142 (1997), that appellate courts review evidentiary decisions for abuse of discretion. *McDaniel*, 398 F.3d at 544. Thus, the district court's evidentiary rulings are reviewed for abuse of discretion. *United States v. Vasilakos*, 508 F.3d 401, 406 (6th Cir. 2007).

A.

Watson argues that the district court abused its discretion by admitting evidence that Watson voluntarily submitted to a polygraph examination and by admitting Watson's statements made before and after the polygraph. The parties have stipulated that the results of the polygraph examination Watson took on February 6, 2001, are inadmissible, but they disagree about whether Watson's voluntary submission to the polygraph and statements made before and afterward are admissible. Although the parties stipulated that "statements made by Defendant Watson are admissible in this case," Watson now claims that it was prejudicial error to admit the statements.

13

"Stipulations voluntarily entered by the parties are binding, both on the district court and on us." *Fed. Deposit Ins. Corp. v. St. Paul Fire & Marine Ins. Co.*,942 F.2d 1032, 1038 (6th Cir. 1991); *see also Parks v. LaFace Records*, 329 F.3d 437, 444 n.2 (6th Cir. 2003). Stipulations "conserve[] judicial resources and allow[] the parties" and the trier of fact "to focus on truly disputed issues." *Fed. Deposit Ins. Corp.*, 942 F.2d at 1038. Watson chose a litigation strategy that agreed to the stipulations after the district court overruled his motion *in limine* to keep the evidence out in order to minimize testimony about the polygraph. His lawyer signed the stipulations and filed them with the court, therefore his argument that the polygraph statements should not have been admitted fails.

Furthermore, the district court properly followed the two-step analysis to determine whether polygraph-related evidence should be admitted. *Wolfel v. Holbrook*, 823 F.2d 970, 972 (6th Cir. 1987). "First, the trial court must determine if the proferred evidence is relevant." *Id.* Second, "it must balance the probative value of the evidence against the hazard of unfair prejudice and/or confusion which could mislead the jury." *Id.* Under the Federal Rules of Evidence, "relevant evidence" is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." FRE 401. In this case, evidence regarding Watson's statements, including his demeanor and the fact that he asked for a deal make it more probable that he was involved in the murder; therefore the evidence is relevant. The probative value of the evidence also outweighs any risk of prejudice because Watson voluntarily submitted to the polygraph and questioning. Indeed, if the evidence had not been admitted, there would have been a strong probability of prejudice or confusion on the part of the jury because it could have appeared "as if he was being railroaded by

14

law enforcement authorities, when there is no evidence to support this." *Fossyl I*, slip op. at 10. The interview lasted several hours and ended with Watson "weeping and ask[ing] for a 'deal,'" and if the polygraph was not mentioned, then "the time-frame alone . . . [could] leave the impression that the officers acted improperly." *Id.* at 9. Given that the evidence was relevant and the probative value outweighed any danger of prejudice or confusion, the district court did not abuse its discretion in admitting the polygraph evidence.

## B.

Watson also objects to the admission of Mr. Chinn's testimony regarding Ms. Chinn's statements to him three months before her death. FRE 802 states that hearsay is generally inadmissible, but the hearsay rule has numerous exceptions. One of those exceptions is FRE 804(b)(3), which provides that a statement against interest is not excluded by the hearsay rule if the declarant is unavailable and the statement was "so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability . . . that a reasonable person in the declarant's position would not have made the statement unless believing it to be true." Watson argues that Mr. Chinn's testimony regarding Ms. Chinn's statements should not have been admitted under FRE 804(b)(3) because there was no showing that Ms. Chinn's statements were so far contrary to her pecuniary interest, or so far tended to subject her to civil or criminal liability, that a reasonable person in her position would not have made the statements unless he believed them to be true. Watson claims that Ms. Chinn's mere presence at a crime scene would not result in any civil liability and that, because Ms. Chinn made the contested statement in 2005, the statutes of limitations had already passed for any crime with which she could be charged. This

argument is unavailing because Ms. Chinn faced potential liability for some of the same civil wrongs for which Watson and Milligan were sued, which could have affected her pecuniary interests. In addition, Ms. Chinn left Ohio to live in Florida sometime after Fossyl's murder, tolling the statute of limitations on several felonies with which she could have been charged, including obstruction of justice, complicity, and failure to aid law enforcement. *See* ORC § 2901.13(G). Therefore, she could have faced civil and criminal liability, and her statements were properly admitted as statements against interest, pursuant to FRE 804(b)(3).

Watson also argues that the statements should not have been admitted under FRE 807, the residual hearsay exception, because no "guarantees of trustworthiness" supported Ms. Chinn's statements. Rather, she was smoking marjiuana and "groggy" at the time due to her cancer treatments. To be admitted pursuant to FRE 807, evidence must be offered to prove a material fact, "must have 'equivalent circumstantial guarantees of trustworthiness'" as evidence admitted under hearsay exceptions FRE 803 and 804, "must be more probative than any other evidence that reasonably could have been procured, and its admission must support the general purposes of the Rules of Evidence and 'the interests of justice.'" *United States v. Darwich*, 337 F.3d 645, 659 (6th Cir. 2003) (citations omitted).

Ms. Chinn's statement was offered to prove material facts surrounding Fossyl's murder, so it satisfies the first prong of the test. It also has circumstantial guarantees of trustworthiness insofar as the life-threatening cancer diagnosis Ms. Chinn faced at the time of her statement may have reduced her incentive to conceal information. Ms. Chinn's statement was more probative than any other evidence that could reasonably be obtained because she was the only person who told a

complete story of what happened that day. Therefore, admission of the statement supported the interests of justice in this case. The hearsay testimony regarding Ms. Chinn's statement met the requirements of FRE 807 and the district court did not abuse its discretion in admitting Ms. Chinn's statements.

C.

Watson asserts that the district court abused its discretion in denying the jury's request for a copy of the transcript of Mr. Chinn's deposition and testimony. He points to various inconsistencies between the testimony and the statement Mr. Chinn had previously given to Creighton. These factual discrepancies were a matter for the jury to consider and weigh in making its decision. *See Eungard v. Open Solutions, Inc.*, 517 F.3d 891, 898 (6th Cir. 2008). We have expressed concern in the past that double exposure to selected testimony may improperly influence a jury. *United States v. Walker*, 1 F.3d 423, 430 (6th Cir. 1993). We have recognized "two inherent dangers" in reading certain testimony to a jury during deliberations: first, the jury may place "undue emphasis" on such testimony, and second, "the limited testimony that is reviewed may be taken out of context by the jury." *Id.; see also United States v. Thomas*, 875 F.2d 559, 562 n.2 (6th Cir. 1989) (affirming denial of a jury's request to re-read witness testimony); *Tschira v. Willingham*, 135 F.3d 1077, 1089 (6th Cir. 1998) (affirming denial of a jury's request that the court re-read selected testimony when the district court noted the inherent dangers of emphasizing the testimony); *United States v. Toney*, 440 F.2d 590, 592 (6th Cir. 1971) (affirming denial of jurors' request for a transcript when the judge told the jurors they had heard the testimony and were the sole judges of the facts). Because double exposure to selected testimony may have led to undue emphasis or have been viewed

out of context by the jury, the district court did not abuse its discretion in denying the jury's request.

D.

Watson's final argument is that the district court erred in limiting Milligan's presentation of other potential suspects in Fossyl's murder, particularly by excluding the testimony of Pohlable and Staubach. We disagree.

Staubach was described as a news reporter who had investigated whether Eugene Gall, a convicted serial rapist and killer who is serving a life sentence, might have been responsible for Fossyl's murder. At her deposition, Staubach testified that she and her husband, who was the editor of the local newspaper for which she worked, believed that Gall should have been the prime suspect in Fossyl's murder in light of the description of the car involved, the composite drawing of the killer, and the similarities between the victims and the circumstances present in Fossyl's murder and Gall's crimes. Staubach gave an account of her discussions with various persons involved in investigating Fossyl's murder. Gall was charged with raping a fourteen-year-old girl in 1977. Gall also murdered a twelve-year-old girl in 1978.

Because Staubach was not qualified as an expert witness, the district court properly evaluated her anticipated testimony under FRE 701, which states that a lay witness's "testimony in the form of opinions or inferences is limited to those opinions or inferences which are . . . rationally based on the perception of the witness." *See also JGR, Inc. v. Thomasville Furniture Indus., Inc.*, 370 F.3d 519, 526 (6th Cir. 2004) (district court abused its discretion by admitting lay testimony of witness who lacked personal perception). The district court observed that Staubach admitted in her deposition that she did not have any contact with witnesses or with anyone with a direct connection

to the case and concluded that she would not have been testifying to anything rationally based on her own perceptions. The district court focused on whether Staubach could properly offer opinion testimony; the court expressly observed that most, if not all, of the evidence Watson sought to introduce through Staubach – evidence pointing to Gall's potential responsibility for the murder – might still be admissible through the testimony of other witnesses. We conclude that Staubach's testimony was properly excluded and the district court did not abuse its discretion.

Pohlable would have testified that Fossyl's alleged killer, a "dope dealer" living in Mexico, wrote to him confessing to the murder. This evidence fails to meet the standards of FRE 804(b)(3) of admissible hearsay as a statement against interest because it is offered to exculpate the accused but it does not have "corroborating circumstances clearly indicat[ing] the trustworthiness of the statement." FRE 804(b)(3). Pohlable did not identify the killer's name, address, or location, nor did he explain his relationship to the killer or explain the circumstances of the killer's confession. The proposed testimony was not supported by corroborating circumstances, and was properly excluded by the district court as inadmissible hearsay. The district court did not abuse its discretion and its ruling should be affirmed.

IV.

For the foregoing reasons, we affirm the district court's rulings.