**OHIO CONTRACTORS ASSOCIATION, et al., Plaintiffs,**

v.

**CITY OF COLUMBUS, OHIO, et al., Defendants.**

No. C2–89–936.

United States District Court, S.D. Ohio, E.D.

April 3, 1990.

Denis J. Murphy, Carlile, Patchen, Murphy & Allison, Columbus, Ohio, for plaintiffs, Ohio Contractors' Ass'n and C. Clark Street.

Thomas E. Palmer, Squire, Sanders & Dempsey, for AmeriFlora 1992, Inc.; Glenn W. Myers, Michael W. Pettit, Squire, Sanders & Dempsey, Columbus, Ohio, of counsel.

Ronald J. O'Brien, Columbus, Ohio, for City of Columbus.

Fred Pressley, Porter, Wright, Morris & Arthur, Columbus, Ohio, for Ruscilli–Smoot Joint Venture.

## MEMORANDUM OPINION AND ORDER

GRAHAM, District Judge.

In 1992 the City of Columbus, Ohio will host an international floral and garden exposition which has been designated as the singular international event in the United States for the 1992 Christopher Columbus Quincentenary Jubilee Celebration. The event will be known as AmeriFlora 1992. The exposition will be organized, promoted and conducted by AmeriFlora '92, Inc. ("AmeriFlora"), a non-profit corporation organized to carry out these functions. The City has agreed to provide city park lands for the site of the exposition and has committed the proceeds of the sale of voter-approved limited tax bonds for the construction of major improvements on the site. The State of Ohio and Franklin County, Ohio have also committed substantial public funds to the project and, in addition, AmeriFlora expects substantial private contributions. The City has agreed to lease three city parks to AmeriFlora and has contracted with it for the construction of improvements on the exposition site. When the exposition has ended, the park lands and the improvements will revert to the City.

Plaintiff Ohio Contractors Association is an association of contractors engaged in the construction business in the City of Columbus and State of Ohio. Plaintiff Clark Street is a citizen of the State of Ohio and a resident and taxpayer of the City of Columbus. Plaintiffs challenge various aspects of the arrangement between the City and AmeriFlora. They seek to have the City's lease and contract with AmeriFlora declared invalid on the grounds that they contain impermissible race- and gender-based affirmative action goals, and they seek to invalidate the contract on the further grounds that it violates provisions of the Columbus City Charter and state law requiring public competitive bidding for the construction of public improvements. They assert a right of public access to AmeriFlora records and to the process of bidding and awarding contracts for AmeriFlora construction projects under the First and Fourteenth Amendments to the United States Constitution and under state law.

Plaintiffs invoke federal jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1343(a)(3) and (4) (jurisdiction over civil rights actions). They assert two federal claims. First, under the rule announced in *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989), they challenge the minority business enterprise ("MBE") and female business enterprise ("FBE") goals contained in the AmeriFlora contract and lease, alleging that they violate the Civil Rights Acts of 1870 and 1871, 42 U.S.C. §§ 1981 and 1983, and the Fourteenth Amendment to the United States Constitution. They further allege that the First and Fourteenth Amendments to the United States Constitution give them a right of access to the records of AmeriFlora and require public access to the opening of AmeriFlora's construction bids. Plaintiffs also assert a number of state law claims which will be discussed below.

At the outset of this litigation, plaintiffs requested a temporary restraining order prohibiting the enforcement of the MBE and FBE affirmative action goals contained in the AmeriFlora contract and lease. On November 14, 1989, the Court granted a temporary restraining order and scheduled a hearing on plaintiffs' request for a preliminary injunction. Prior to the hearing, the City and AmeriFlora, in apparent recognition that its race- and gender-based affirmative action goals were invalid under *Croson*, amended the AmeriFlora contract and lease by eliminating all MBE and FBE contracting and hiring goals. Plaintiffs contended, however, that AmeriFlora's selection of Ruscilli/Smoot Construction Company ("Ruscilli/Smoot") as its construction management firm was tainted by the affirmative action plan requirements, that the bidding procedures followed by Ruscilli/Smoot before the elimination of the MBE and FBE goals required the rebidding of the initial contracts for the Academy Park athletic facility, and that AmeriFlora and Ruscilli/Smoot were required to engage in public competitive bidding for AmeriFlora construction projects.

A hearing was held on plaintiffs' motion for a preliminary injunction on December 4 and 5, 1989, and on December 6, the Court rendered its decision granting a preliminary injunction against the inclusion of race- and gender-based contracting and hiring goals in the AmeriFlora lease and contract; granting a preliminary injunction requiring AmeriFlora to rebid the Academy Park project; denying a preliminary injunction with respect to the selection of Ruscilli/Smoot as AmeriFlora's construction management firm; and denying a preliminary injunction which would require Ruscilli/Smoot to change its method of awarding subcontracts. The Court stated its findings of fact and conclusions of law on the record of the proceedings on December 6, 1989. On January 17, 1990 the parties filed an agreed order of permanent injunction incorporating the preliminary injunctive relief granted on December 6, 1989. On March 6, 1990, the parties filed an agreed order reciting the fact that the trial of the action on the merits of plaintiffs' 42

U.S.C. § 1981, 42 U.S.C. § 1983, and Fourteenth Amendment claims was consolidated with the hearing on the application for preliminary injunction held on December 4 and 5, 1990 and that the order of January 17, 1990 resolved those claims.

At a status conference held on December 14, 1989, it was agreed that all remaining issues would be submitted to the Court on cross-motions for summary judgment. This was confirmed by the agreed order of March 6, 1990. The cross-motions for summary judgment are now before the Court for ruling.

## FEDERAL CLAIMS

### TITLE 42, U.S.C. §§ 1981 AND 1983 AND FOURTEENTH AMENDMENT EQUAL PROTECTION CLAIMS

The story of how affirmative action goals became embedded in the AmeriFlora contract and lease is an instructive case history for those interested in the issues raised by the Fourteenth Amendment's guarantee of equal treatment of all citizens and a local government's grant of race-based preferences to minority citizens. In *Croson*, Justice O'Connor noted that one justification offered by those who argue for relaxed scrutiny of racial classifications designed to benefit minorities is that they supposedly "involve a choice made by dominant racial groups to disadvantage themselves." 488 U.S. at ——, 109 S.Ct. at 722. Noting that blacks comprised approximately fifty percent of the population of the City of Richmond and that five of the nine seats on the city council were held by blacks, Justice O'Connor concluded:

> Even were we to accept a reading of the guarantee of equal protection under which the level of scrutiny varies according to the ability of different groups to defend their interests in the representative process, heightened scrutiny would still be appropriate in the circumstances of this case.

*Id.* The black population of the City of Columbus is approximately 22%. Two of seven city council members are black and two are female. The facts of the present

case, however, demonstrate that the political power of a minority group need not rise to the level present in *Croson* in order to impact the legislative process in such a way as to justify a strict scrutiny analysis. Indeed it would seem apparent that any time a special interest group—racial, ethnic, or otherwise—holds the balance of political power, there is a risk that local government may accede to its demands at the expense of the rights of other citizens. This is particularly true where the matter at stake is one of great importance to the community and the special interest group has the ability to seriously impede or frustrate its accomplishment.

From the time of its announcement, AmeriFlora and the City came under intense political pressure from the black community to maximize the benefits the project might confer on black citizens and minimize any adverse impact it might have on the black community. Because of the exhibitions' vast importance to the community and its very tight time schedule, the City and AmeriFlora were especially vulnerable to political pressure. The Black community raised legitimate concerns about the potential disruption of predominantly black neighborhoods as a result of increased traffic and commercial activity during the exhibition and the closing of a major public park located adjacent to a black neighborhood. Leaders of the black community also began asserting claims for a share of the economic benefits which would flow from the project. For example, on August 1, 1988, Walter R. Cates, Sr., a vocal member of the black community, wrote to AmeriFlora's director reminding him of "minority concerns for sharing of the dollars from AmeriFlora," threatening to stir up opposition in the black community and the use of political influence and litigation to thwart the project unless "in the spirit of harmony you ... can resolve an equitable 35% set-aside arrangement for minority participation." (Preliminary Injunction Hearing Exh. 117). A group of black leaders formed themselves into an organization known as the Black 1992 Leadership Coalition which lobbied the City and AmeriFlora on behalf of its constituency.

On July 25, 1988, at a meeting of the Columbus City Council, an ordinance was introduced authorizing the Department of Recreation and Parks to enter into a lease agreement with AmeriFlora. As a result of demands made at this meeting by members of the black community, the ordinance was amended on the floor to add the following language:

> ... such authority contingent upon the Director of Recreation and Parks, the Chairman of the Recreation and Parks Commission, and Council agreeing upon a specific minority, FBE business and EEO participation being made a part of said lease agreement with AmeriFlora 1992 Inc.

(Preliminary Injunction Hearing Exh. 15). Thereafter, the President of City Council, Jerry Hammond, himself a prominent member of the black community and a supporter of its demands, assembled a committee for the purpose of determining just what kind of affirmative action requirements would be imposed upon AmeriFlora. This committee consisted of Hammond; the Reverend Jessie L. Wood, Chairman of the 1992 Black Leadership Coalition; former United States District Judge Robert M. Duncan, a prominent member of Columbus' black community, who represented AmeriFlora as a member of its board of trustees; and James Barney, Director of the Recreation and Parks Department. Mr. Barney testified that his only role "was to determine how we could easily monitor and ensure whatever was decided upon would happen." (Dec. 4, 1989 Preliminary Injunction Hearing Transcript at 73). The committee did not include any representatives of the community at large, nor did it include any representatives of non-minority contractors. The primary focus of this committee was to determine the numerical percentage of a minority contracting goal to be imposed upon AmeriFlora. The percentages discussed by the committee ranged from 40% down to 10.6%, which was the minority contracting goal contained in an existing City ordinance. Former Judge Duncan advocated 15%, which was roughly equivalent to the percentage of black citi-

zens in the population of Franklin County, but this was not acceptable to those who spoke on behalf of the black community. The situation remained at an impasse until Council President Hammond was approached by a black entrepreneur, Floyd Shepherd, who offered to assist in resolving the impasse by preparing a report containing recommended MBE and FBE goals for the AmeriFlora project. Mr. Shepherd's interest arose from his desire to have his firm retained by AmeriFlora to manage its Equal Employment Opportunity ("EEO") compliance functions. Council President Hammond arranged for the City to employ Mr. Shepherd as a consultant, and Mr. Shepherd prepared a five page report which recommended that the City use a work force index to define the goals for minority participation in AmeriFlora construction projects. Using 1980 census data, which is readily available to the public, Mr. Shepherd calculated the ratio of the minority labor force to the total labor force in the City of Columbus as 21.3% and thus recommended:

> that the minimum goals for the minority participation in AmeriFlora contracts (in dollar terms) should be 21 percent. Similarly, the average minority employment level for all contractors is proposed to be at least 21 percent.

(Preliminary Injunction Hearing Exh. 22). Mr. Shepherd's recommendations were adopted by the committee and were accepted by AmeriFlora and the City with little discussion.

In the context of these negotiations, AmeriFlora was also required to appoint a full-time EEO compliance officer. AmeriFlora acceded to that request as well. Council President Hammond then recommended that AmeriFlora hire Marvin Jones as its EEO officer and it did so. Mr. Jones, a political ally of Hammond, is a member of the black community who has been active in state and local politics. Thereafter, an addendum was prepared to the AmeriFlora lease incorporating the MBE and FBE affirmative action goals and AmeriFlora's agreement to hire its own EEO compliance officer.

The evidence revealed that, upon assuming his duties, Mr. Jones perceived that his mission was to ensure that AmeriFlora not only met but exceeded its MBE goals. He demanded access to confidential bidding information of AmeriFlora's construction management firm, Ruscilli/Smoot, and a role in Ruscilli/Smoot's decisions on bid awards. Although AmeriFlora and Ruscilli/Smoot resisted these demands, they do raise serious questions about the propriety of the methods by which Mr. Jones intended to accomplish his perceived mission.

A further consequence of the negotiations with AmeriFlora and the Shepherd report was the amendment of the City's ordinances relating to affirmative action goals for City contracts. The numerical goals set forth in § 3907.01, .02, and .03 of the Columbus City Codes were increased from 10.6% to 21%.

There is no evidence that, in imposing these goals on AmeriFlora or in enacting this legislation, the committee or City Council ever considered the question of whether there had been a history of discrimination against minority contractors in the community of Columbus, Ohio which would justify a remedial affirmative action program. Mr. Shepherd conducted no such research. There was no effort to determine the number of minority contractors doing business in the Columbus, Ohio community or the percentage they represent of all contractors doing business in the community. Thus the figure of 21% bears no relationship to any known ratio of minority contractors to non-minority contractors. No research was done to determine the dollar amount of contracts awarded by the City to minority contractors in the past, nor was any effort made to determine whether their share of City contracting business was disproportionately low in comparison to their numbers. No attempt was made to determine the percentage of minority construction tradesmen and laborers in the Columbus community, thus the figure of 21% bears no relationship to any known ratio of minority construction tradesmen and laborers to non-minority construction tradesmen and laborers in the Columbus community. No effort was made to deter-

mine whether there was any evidence that construction contractors operating in the Columbus community had discriminated in the employment of black tradesmen or laborers or that they were underrepresented in the ranks of such employees.

The evidence suggests that instead of urging minority contracting goals as a remedy for past discrimination, the leadership of the black community demanded them as an entitlement based solely on the numerical representation of blacks in the work force, and they wielded sufficient political power to persuade the City and AmeriFlora to accede to their demands.

The enforcement mechanism appended to the minority construction goals effectively transformed them into quotas with the result that minority contractors were essentially guaranteed 21% of all construction dollars spent by AmeriFlora, thus excluding non-minority contractors from competing for those construction dollars. In *Croson*, the Supreme Court referred to testimony that only 4.7% of all construction firms in the United States are minority owned and that 41% of them are located in California, New York, Illinois, Florida and Hawaii. 488 U.S. at ——, 109 S.Ct. at 713–15. It seems likely therefore that 4.7% or less of all construction firms in the Columbus, Ohio community are minority owned. If this is the case, then the system imposed on AmeriFlora would require the award of 21% of its construction contract dollars to 4.7% or less of the construction firms in the community, based solely upon their race. This amounts to a windfall or subsidy of minority contractors at the expense of non-minority contractors.

The facts in the *Croson* case reveal how such plans can result in subsidies to MBEs, imposing additional costs on non-minority contractors or the contracting agency. Under the Richmond plan, prime contractors who were awarded city contracts were required to subcontract at least 30% of the dollar amount of their contract to one or more MBEs. Croson, a non-minority plumbing contractor headquartered in Columbus, Ohio, was the successful bidder on a contract for the provision and installation

of certain plumbing fixtures at the Richmond City Jail. The city specified two manufacturers of plumbing fixtures for the project. In order to meet the 30% set aside requirement, Croson would have to purchase these fixtures from a minority contractor but, after contacting five or six MBEs who were potential suppliers and after contacting three local and state agencies that maintained lists of additional MBEs, no MBE expressed an interest in the project or tendered a quote for the fixtures prior to Croson being awarded the contract. Thereafter an MBE did submit a bid to Croson at a figure over $6,000 higher than the price Croson had included for the fixtures in its bid to the city. This constituted a 7% increase over the market price for the fixtures which, with added bonding and insurance, would have raised the cost of the project by over $7,000. The MBE was not an authorized supplier for either of the fixture manufacturers and his bid was substantially higher than any other quotation Croson had received. Nevertheless the City of Richmond required Croson to accept this bid and refused to permit it to raise its contract price, thus forcing Croson to absorb the extra cost of purchasing these fixtures from the MBE.

The facts of the present case underscore the importance of the principles enunciated by Justice O'Connor in her opinion in *Croson*:

> Absent searching judicial inquiry into the justification for such race-based measures, there is simply no way of determining what classifications are "benign" or "remedial" and what classifications are in fact motivated by illegitimate notions of racial inferiority or simple racial politics. Indeed, the purpose of strict scrutiny is to "smoke out" illegitimate uses of race by assuring that the legislative body is pursuing a goal important enough to warrant use of a highly suspect tool. ...
>
> Classifications based on race carry a danger of stigmatic harm. Unless they are strictly reserved for remedial settings, they may in fact promote notions

of racial inferiority and lead to a politics of racial hostility.

488 U.S. at ——, 109 S.Ct. at 721.

[T]here is a danger that a racial classification is merely the product of unthinking stereotypes or a form of racial politics. "[I]f there is no duty to attempt either to measure the recovery by the wrong or to distribute that recovery within the injured class in an evenhanded way, our history will adequately support a legislative preference for almost any ethnic, religious, or racial group with the political strength to negotiate 'a piece of the action' for its members."

488 U.S. at ——, 109 S.Ct. at 730 (quoting *Fullilove v. Klutznick*, 448 U.S. 448, 539, 100 S.Ct. 2758, 2806, 65 L.Ed.2d 902 (1980) (Stevens, J., dissenting)).

This case is an example of the use of minority political power not to remedy discrimination but to negotiate a "piece of the action" for its members. While in the past minorities may have themselves been the victims of racial politics, two wrongs do not make a right. As Justice Powell observed in *Regents of the University of California v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978), "[t]he guarantee of equal protection cannot mean one thing when applied to one individual and something else when applied to a person of another color." *Id.* at 289–90, 98 S.Ct. at 2748.

Under *Croson* the granting of race based preferences to minority contractors and minority construction employees must be based on firm evidence that they are in fact underrepresented in relation to their presence in the community and that such underrepresentation is the product of past discrimination. Even then, race based preferences must be carefully tailored to fit the remedial goal. 488 U.S. at —— ——, 109 S.Ct. at 723–29.

Past societal discrimination alone cannot serve as the basis for racial preferences. If it could, a multitude of ethnic, religious, and racial groups could legitimately assert such claims and "[t]he dream of a Nation of equal citizens in a society where race is irrelevant to personal opportunity and achievement would be lost in a mosaic of shifting preferences based on inherently unmeasurable claims of past wrongs." 488 U.S. at ——, 109 S.Ct. 727.

On August 21, 1989, the Associated General Contractors of America filed suit against the City of Columbus in this Court challenging the constitutionality of the City's affirmative action goals for City contracting set forth in § 3907.01, .02, and .03 of the Columbus City Codes on the ground that they violated the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. Ironically, these affirmative action goals were passed by the Columbus City Council on the same day, January 23, 1989, that the Supreme Court handed down the *Croson* decision. Not until September 25, 1989, however, did the City adopt an ordinance rescinding the affirmative action goals contained in these ordinances. Nevertheless, the City took no action to remove the identical affirmative action goals which it had imposed on AmeriFlora. AmeriFlora continued to abide by those provisions of its lease and contract until the present plaintiff commenced this action on November 13, 1989 and this Court granted a temporary restraining order.

In apparent recognition that the affirmative action goals were unconstitutional, the City by ordinance deleted them from the AmeriFlora lease on November 13, 1989 and from the AmeriFlora contract on November 20, 1989. As stated above, the Court then held a hearing on plaintiffs' motion for a preliminary injunction and on December 6, 1989 the Court granted in part plaintiffs' request for preliminary injunctive relief. On January 17, 1990, the City agreed to an order of permanent injunction eliminating affirmative action goals from AmeriFlora projects funded by the City and limiting the role of its EEO officer to "discovering and preventing discrimination against contractors and employees." Jan. 17, 1990 Order of Permanent Injunction. This order and the subsequent order of March 6, 1990 constitute a final judgment on plaintiffs' 42 U.S.C. §§ 1981, 1983 and Fourteenth Amendment equal protection claims.

## FIRST AMENDMENT CLAIMS

Plaintiffs claim that the records of AmeriFlora are public records within the ambit of the First and Fourteenth Amendments to the United States Constitution. In support of this contention, plaintiffs argue alternatively that AmeriFlora is either itself a public institution and its records should be open to the public or that it is merely an alter ego of the City of Columbus, the records of which are public by nature of its existence as a governmental entity. The AmeriFlora records to which plaintiffs seek access are the records relating to the bidding and award of construction contracts. Plaintiffs allege that the First Amendment requires that AmeriFlora's construction management firm, Ruscilli/Smoot, open its construction bids in public and that all documents relating to the award of bids must be open to public inspection.

The contract between the City and AmeriFlora is a guaranteed price contract wherein AmeriFlora agrees to construct specified improvements for a guaranteed maximum price. The contract further provides that "the City shall pay within such maximum the cost of labor and materials plus a fixed percentage of profit to the Contractor. Percentage shall be 2%." Preliminary Injunction Hearing Exh. 62. AmeriFlora has entered into a contract with its construction management firm, Ruscilli/Smoot, wherein Ruscilli/Smoot agrees to provide AmeriFlora with a guaranteed maximum price for each component of the project. The agreement contemplates that Ruscilli/Smoot will then select qualified subcontractors through a private bidding procedure. In the event all responsive bids for any given component exceed the guaranteed price for that component, Ruscilli/Smoot, may, at its option, perform the work itself with its own forces for the guaranteed amount. Having entered into a guaranteed price contract with AmeriFlora, Ruscilli/Smoot is unwilling to permit the award of construction contracts through a public bidding procedure since it would then have no control over the final cost, which might well exceed its guaranteed price.

The bidding procedure adopted by Ruscilli/Smoot in awarding subcontracts is as follows: Ruscilli/Smoot will select a limited number of qualified contractors who will be invited to bid; the bids will be opened privately on a pre-announced date and reviewed by Ruscilli/Smoot to determine which bidders have complied with the bidding requirements as to the scope of the work and have submitted the best and lowest bids; Ruscilli/Smoot will then privately negotiate with the two or three best and lowest bidders in an effort to obtain the best price. During this process, bid specifications may be changed where substitutions would not affect the quality of the work. This process is referred to as "value engineering." In order for this process to work, it must be conducted through private negotiations between the construction management firm and the individual bidders. This is a common procedure in the construction industry and is utilized in most large construction projects. This form of bidding is also particularly advantageous when, as here, time constraints require that the bidding process begin before the final construction documents are completed. The procedure permits the negotiation of a final price incorporating the final design at an agreed price and avoids the potentially expensive process of incorporating final design details through the use of change orders.

Plaintiffs allege that these procedures violate their First and Fourteenth Amendment rights "in that the expenditure of public funds by AmeriFlora entitles the plaintiffs to access to the proceedings by which contracts are let." First Amended Verified Complaint at Para. 39. For the purposes of analyzing plaintiffs' First Amendment claims, the Court will assume *arguendo* that AmeriFlora is the alter ego of the City.

In *Houchins v. KQED, Inc.*, 438 U.S. 1, 98 S.Ct. 2588, 57 L.Ed.2d 553 (1978), the Supreme Court quoted with approval the following statement from a law review article authored by Justice Stewart:

There is no constitutional right to have access to particular government informa-

tion, or to require openness from the bureaucracy. The public's interest in knowing about its government is protected by the guarantee of a Free Press, but the protection is indirect. The Constitution itself is neither a Freedom of Information Act nor an Official Secrets Act. *Id.* at 14, 98 S.Ct. at 2596 (quoting Stewart, *Or of the Press*, 26 Hastings L.J. 631, 636 (1975) (citation omitted). The Court concluded that:

> Neither the First Amendment or the Fourteenth Amendment mandates a right of access to government information or sources of information within the government's control.

*Id.* at 15, 98 S.Ct. at 2597.

*Houchins* would lead to the conclusion that plaintiffs' First and Fourteenth Amendment public access claims should be dismissed without further discussion. However, in a separate line of cases involving media access to criminal trials, the Supreme Court has applied a two part test in determining whether or not the First Amendment provides a right of access to a governmental proceeding. In *Press–Enterprise Co. v. Superior Court*, 478 U.S. 1, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986), the Court articulated this test as follows:

> In cases dealing with the claim of a First Amendment right of access to criminal proceedings, our decisions have emphasized two complementary considerations. First, because a " 'tradition of accessibility implies the favorable judgment of experience,' " *Globe Newspaper*, [*Co. v. Superior Court for County of Norfolk* ] 457 U.S. [596] at 605 [102 S.Ct. 2613, 2619, 73 L.Ed.2d 248 (1982) ] (quoting *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 589 [100 S.Ct. 2814, 2834, 65 L.Ed.2d 973] (1980) (BRENNAN, J., concurring in judgment)), we have considered whether the place and process have historically been open to the press and general public.
>
> \*   \*   \*   \*   \*   \*
>
> Second, in this setting the Court has traditionally considered whether public access plays a significant positive role in the functioning of the particular process

in question. *Globe Newspaper, supra*, at 606 [102 S.Ct. at 2619]. Although many governmental processes operate best under public scrutiny, it takes little imagination to recognize that there are some kinds of government operations that would be totally frustrated if conducted openly.

*Id.* at 8–9, 106 S.Ct. at 2740–41. The Court concluded that public access to criminal trials was based upon an historic tradition and enhanced basic fairness and the appearance of fairness essential to public confidence in the system.

▆ Since *Houchins* has not been overruled, this Court concludes that it correctly states the general rule applicable to this case, namely, that the First Amendment does not guarantee public access to governmental information. *Press–Enterprise Co.* and related cases represent a limited exception to that rule which has been applied only to criminal trials. But even if this Court were to apply the principles of *Press–Enterprise Co.* to the present case, it would conclude that plaintiffs have not satisfied either branch of its two part test. Plaintiffs have not shown that the process through which a contractor performing a public works project selects its subcontractors has historically been open to the press and general public, nor have plaintiffs shown that such access would play a significant positive role in the functioning of that particular process.

Plaintiffs argue that "[i]n Ohio it is the rule rather than the exception that public works using public funds have been accomplished by contracts let through competitive bidding, with awards publicly announced and bid records available for inspection after opening." Plaintiffs' Memorandum in Support of Motion for Summary Judgment at 28. Citing Chapters 153 and 715 of the Ohio Revised Code, plaintiffs argue that there is a tradition of public access to the bidding process which "secures and fosters the integrity of the award of public works projects." Plaintiffs' Memorandum in Support of Motion for Summary Judgment at 28.

There is no evidence that the City's selection of AmeriFlora or AmeriFlora's selection of Ruscilli/Smoot was not subject to public scrutiny. Indeed, it appears that both selections were attended by much publicity. Nor is there any evidence that the records of AmeriFlora and Ruscilli/Smoot regarding the award of subcontracts will not be made available to plaintiffs and the public once the subcontracts are awarded. AmeriFlora concedes that it is subject to the provisions of Ohio Revised Code § 149.431 of the Ohio Revised Code, which requires that all nonprofit corporations which enter into contracts with political subdivisions of the state must keep complete financial records of monies expended performing services pursuant to such contracts and that such contracts and financial records are public records. Reply Memorandum of AmeriFlora 1992, Inc at. 5, 6. John C. Peterson, Executive Director of AmeriFlora, testified that sometime during 1989 AmeriFlora received a request from a local television station to inspect its records.

[Question]: What kind of records did you turn over at that time?

[Answer]: We turned over all the financial records relating to the expenditure of city moneys, including all the vouchers and everything associated with that.

Dec. 4, 1990 Preliminary Injunction Hearing Transcript at 185.

■ This Court is aware of no historical tradition that a firm which has been awarded a contract for the construction of public works must select its subcontractors through a public competitive bidding process. Plaintiffs have presented no evidence of such a tradition. Much of the testimony at the hearing on plaintiffs' request for a preliminary injunction was to the contrary and indicated that in fact it is customary in the construction industry for contractors performing both private and public construction work to select their subcontractors in the same way AmeriFlora and Ruscilli/Smoot propose to select their subcontractors.

■ In order to bring this case within the rule of *Press-Enterprise Co.*, plaintiffs would have to show a national historical tradition of public access. Plaintiffs have failed to make such a showing. Plaintiffs must also show that public access plays a significant positive role in the functioning of the particular process in question. At the hearing on the preliminary injunction, defendants' witnesses testified that private negotiations with prospective subcontractors is the most expeditious and cost effective method. Plaintiffs' witnesses disagreed, but the Court concludes that plaintiffs' evidence falls short of that required to establish a constitutional right of public access.

Again, it should be stressed that the evidence does not raise any issue regarding public access to the final subcontracts or the bids which preceded them. There is no evidence that AmeriFlora and Ruscilli/Smoot have denied or intend to deny public access to those documents, only that they wish to preserve the privacy of the bid opening and final negotiations with the bidders. Plaintiffs are attempting to use the First Amendment to impose a requirement of public competitive bidding on all contracts and subcontracts relating to this project. Such a claim is legally and factually unsupportable and is rejected. Defendants are entitled to summary judgment on plaintiffs' First and Fourteenth Amendment claims.

## STATE LAW CLAIMS
### PENDENT JURISDICTION

Following *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), the United States Court of Appeals for the Sixth Circuit held in *In re Southern Industries Banking Corp.*, 872 F.2d 1257, 1263 (6th Cir.1989):

Pendent jurisdiction arises from the power of federal courts to hear cases and controversies "arising under [the] Constitution [and] the Laws of the United States." U.S. Const. art. III, § 2, cl. 1. When there is a substantial federal claim that arises from a common nucleus of operative fact with a state claim, and

those claims would ordinarily be expected to be tried together, then a federal court has the discretionary power to treat the claims as one "case" arising under the laws of the United States. *United Mine Workers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966); *Transcontinental Leasing Inc. v. Michigan Nat'l Bank*, 738 F.2d 163, 165 (6th Cir.1984). Indeed, federal courts could not function efficiently if they could not decide all of the issues of fact and law that may be before them. See 13B C. Wright and A. Miller, *Federal Practice & Procedure* § 3567 (1984). Rather than depending upon an independent basis for jurisdiction, then, pendent claims are properly heard only when they are in a sense part of a "case" that presents a cognizable and substantial federal question.

In this case, plaintiffs' federal claims under 42 U.S.C. §§ 1981 and 1983 and the Equal Protection Clause of the Fourteenth Amendment are substantial federal claims that arise from a common nucleus of operative fact with plaintiffs' state claims.

In *United Mine Workers v. Gibbs*, the Supreme Court said:

> It has consistently been recognized that pendent jurisdiction is a doctrine of discretion, not of plaintiff's right. Its justification lies in considerations of judicial economy, convenience and fairness to litigants; if these are not present a federal court should hesitate to exercise jurisdiction over state claims, even though bound to apply state law to them, *Erie R. Co. v. Thompkins*, 304 U.S. 64 [58 S.Ct. 817, 82 L.Ed. 1188 (1938)]. Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law. Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well. Similarly, if it appears that the state issues substantially predominate, whether in terms of proof, of the scope of the issues raised, or of the comprehensiveness of the remedy

sought, the state claims may be dismissed without prejudice and left for resolution to state tribunals.

383 U.S. at 726, 727, 86 S.Ct. at 1139, 1139.

In *Rosado v. Wyman*, 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970) the Supreme Court gave further attention to the factors which should control a federal court's exercise of pendent jurisdiction after the dismissal of the federal claims which formed the basis for federal jurisdiction. The Court said:

> We are not willing to defeat the common-sense policy of pendent jurisdiction—the conservation of judicial energy and the avoidance of multiplicity of litigation—by a conceptual approach that would require jurisdiction over the primary claim at all stages as a prerequisite to resolution of the pendent claim. 397 U.S. at 405, 90 S.Ct. at 1214.

In *Province v. Cleveland Press Publishing Co.*, 787 F.2d 1047 (6th Cir.1986) the sixth circuit reconciled *United Mine Workers* and *Rosado* and formulated the rule which governs a trial court's discretion to decide pendent state law claims once the basis for federal jurisdiction is dismissed. The court held:

> ▮ Reading *United Mine Workers* and *Rosado* together, it is apparent that trial courts do possess some discretion to decide a pendent state law claim once the federal basis for jurisdiction is dismissed. A trial court must balance the interests in avoiding needless state law decisions discussed in *United Mine Workers* against the "commonsense" policies of judicial economy discussed in *Rosado*, when deciding whether to resolve a pendent state claim on the merits.
>
> Through a series of cases following *United Mine Workers*, this circuit has adopted the position that the district courts have minimal discretion to decide pendent state law claims on the merits once the basis for federal jurisdiction is dismissed before trial.

787 F.2d 1047.

## THE STATE LAW CLAIMS

The state law claims asserted by the plaintiffs are as follows:

(1) the Columbus City Charter requires public bidding of the AmeriFlora contract;

(2) Ohio Revised Code § 153.12 requires public bidding of the AmeriFlora contract;

(3) AmeriFlora is the City's alter ego created to avoid competitive bidding and open records requirements;

(4) AmeriFlora is a public instrumentality within the meaning of Ohio Revised Code § 153.12, and itself bound by the competitive bidding requirements of that statute;

(5) AmeriFlora's records are public records within the meaning of Ohio Revised Code § 149.43; and

(6) the City and AmeriFlora have not complied with their own interpretation of the Columbus City Charter and thus the AmeriFlora contract and all payments made thereunder are illegal.

These claims raise a multitude of questions of state law, some of which are questions of first impression.

Columbus City Code Chapter 329 addresses procurement of goods and services. Section 329.06(B) of this chapter requires competitive bidding for construction contracts but a subsequent section provides that City Council may waive any of the provisions of this chapter when it determines that it is in the best interests of the City. In the ordinance authorizing the AmeriFlora contract, City Council expressly waived competitive bidding. Plaintiffs claim, however, that this procedure violates the City Charter which takes precedence over any City ordinance. Plaintiffs claim that § 186 of the Charter requires public bidding of the AmeriFlora contract. Defendants assert that the history of § 186 shows that it was intended to apply only to public improvements financed by assessments, whereas the AmeriFlora improvements are financed by councilmanic bonds. In the alternative, defendants argue that § 186 permits the City to contract for improvements without public bidding when the contract contains a guaranteed maximum and a stipulation that the City shall pay within the maximum the cost of labor and materials plus a fixed percentage of

profit, allegedly the kind of contract which the City entered into with AmeriFlora. Both of these questions of interpretation of the Columbus City Charter are questions of first impression which no Ohio court has ever addressed.

Defendants' first argument, that § 186 does not apply to public improvements financed by bonds, turns on the meaning to be attributed to it in its original context as adopted by the citizens of Columbus in May, 1914 and in light of the repeal of certain companion provisions sixty years later in 1974. The City argues that § 186 applies to "local improvements," which it says is a unique term possessing a specific meaning as used in the Charter, namely, that it means improvements financed by assessments. The City then argues that the Charter uses the term "local improvements" interchangeably with the term "public improvements" and that accordingly they have the same special meaning—again, improvements financed by assessments. By this process defendants argue that § 186, which refers to public improvements, was meant to apply only to improvements financed by assessments. Defendants then argue that original Charter § 162, entitled "Contracts—How Let" and which required public bidding "when any expenditure in any department other than the compensation of persons employed therein exceeds $500," was the Charter section that was intended to govern public improvements financed by means other than assessments. Section 162 was repealed by a vote of the electorate in 1974, hence defendant argues that thereafter such contracts are no longer subject to public bidding requirements.

The Court notes, however, that § 162 could be viewed as a provision originally intended to apply to purchasing contracts by City departments, not the construction of public improvements. In this respect, it may be significant that the preamble to the repealer of § 162 specifically refers to the restrictions it imposed on the City's ability to function efficiently and effectively in the area of purchasing. The Court further notes that § 186 expressly refers to "public improvements of all kinds" not just public

improvements financed by assessments. Thus a court might conclude that § 186 was intended to apply to all contracts for public improvements, that § 162 was intended to apply to purchasing contracts, and that the 1974 repeal of § 162 was not intended to dispense with public bidding of contracts for public improvements. Although the City now contends that § 186 is not applicable to the AmeriFlora contract, it is to be noted that the City Attorney himself relied on § 186 when he rendered an opinion to City Council that the AmeriFlora contract was not required to be competitively bid.

If the Court were to reject the City's present argument on the non-applicability of § 186, it would then be faced with the difficult question of interpreting that Charter section. Section 186 of the Columbus City Charter reads as follows:

> Sec. 186. Public improvements by contract or direct labor. Public improvements of all kinds may be made by the appropriate department either by direct employment of the necessary labor and the purchase of the necessary supplies and materials, with separate accounting as to each improvement so made, or by contract duly let after competitive bidding, either for a gross price, or upon a unit basis for the improvement, or by contract containing a guaranteed maximum and stipulating that the city shall pay within such maximum the cost of labor and materials, plus a fixed percentage of profit to the contractor. The council shall by ordinance determine by which of the foregoing methods any improvement shall be made. Contracts may provide a bonus per day for completion of the contract prior to a specified date, and liquidated damages to the city to be exacted in like sum for every day of delay beyond a specified date.

A key word in construing this provision is the word "either." The proper usage of the word "either" is to refer to the one and the other of two options. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 728 (1981). However, the word is sometimes used less precisely to refer to two or more options. The word "either" is used twice in § 186. If the word "either" is used in the first instance to refer to two options, then the two types of contracts for public improvements are 1) "by direct employment of the necessary labor and the purchase of the necessary supplies and materials," or 2) "by contract duly let after competitive bidding." Under this interpretation, the second "either" would then set forth an enumeration of the types of contracts for public improvements which are required to be competitively bid. The problem lies in the fact that there are apparently three options which must be taken into account. The last option could not be included under the two basic types of contracts for public improvements since the first "either" has already been satisfied by two options.

The second "either" could be construed consistently with proper usage with the two options being 1) "for a gross price," and 2) "upon a unit basis." The problem with this construction is that the first "either" would then refer to three options with the third being "by contract containing a guaranteed maximum." A reasonable interpretation squaring with a proper usage of the word "either," however, is to construe the first "either" as referring to either by direct employment or by competitive bidding. The second "either" would refer to either 1) "for a gross price, or upon a unit basis for the improvement," or 2) "by contract containing a guaranteed maximum." Gross price and unit price could be reasonably grouped grammatically as relating to "for the improvement" and conceptually as referring to one type of contract, a set price, either for the entire project or a portion thereof.

The defendants, however, contend that the parallel usage of the preposition "by" renders the provision unambiguous. Indeed, one interpretation of the provision would be that the type of contracts for public improvements are 1) "*by* direct employment of the necessary labor and the purchase of the necessary supplies and material," 2) "*by* contract duly let after competitive bidding," or 3) "*by* contract containing a guaranteed maximum." (Empha-

sis added). This is certainly a reasonable interpretation. However, if the drafters of this provision had intended to use parallelism of prepositions, why then did they not use parallel prepositions after the second "either"? Instead, they stated "either *for* a gross price, or *upon* a unit basis." (Emphasis added). Furthermore, if direct employment and guaranteed maximum contracts were not intended to require competitive bidding, then why were they not grouped together instead of separated by the provisions for competitive bidding?

In short, § 186 can reasonably be interpreted at least three different ways.

I. Either
1) by direct employment, *OR*
2) by competitive bidding, either
   a) for a gross price, *or*
   b) upon a unit basis,

OR

3) by a guaranteed maximum

II. Either
1) by direct employment, *OR*
2) by competitive bidding, either
   a) for a gross price, *or*
   b) upon a unit basis, *or*
   c) by a contract containing a guaranteed maximum

III. Either
1) by direct employment, OR
2) by competitive bidding either
   a) for a gross price, or upon a unit price for the improvement,

*or*

   b) by a contract containing a guaranteed maximum.

■ Therefore, the Court concludes that § 186 is ambiguous and must be interpreted in light of the legislative history and how it was understood at the time of its enactment. This Court is not satisfied that the present record is adequate for a decision of this important question of state and local interest. The record does not include any materials which would shed light on the intent of the drafters of the 1914 Charter or the voters who adopted it. One must assume that this important act of the electorate was preceded by debate and publicity regarding the intent and meaning of the various provisions of the Charter. It would seem likely that such debate and publicity would have included such an important provision as the public bidding of contracts for public improvements. It would also be interesting to know how City administrations of the 1910s and 20s conducted themselves under these Charter provisions. Those administrations would be presumed to have some knowledge of the intent of the drafters of the Charter and the electorate. It would be interesting to know whether or not the City governments of that era entered into contracts like the present one without competitive bidding.

The proper interpretation of the provisions of the Columbus City Charter relating to the award of contracts for the construction of public improvements is best left to the state courts which have a better grasp of the historical traditions and public policies of the state in such matters. This Court feels constrained to heed the warning of *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) that:

> Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law.

*Id.* at 726, 86 S.Ct. at 1139.

The remaining state law claims would also unnecessarily involve this Federal Court in deciding important questions of state law in which the public policy of the State of Ohio is an important factor. Certainly this is the case with respect to the question raised by the applicability of Ohio Rev.Code § 153.12, which requires municipalities in the State of Ohio to competitively bid contracts for public improvements. Defendants argue that the City of Columbus is a chartered home rule municipality exercising the powers of self-government under Ohio's Home Rule Amendment, Art. XVIII, § 3 of the Ohio Constitution. Plaintiffs counter with the argument that home rule municipalities are free to enact only

such regulations "as are not in conflict with general laws" and assert that § 153.12 is a general law applicable to all municipalities, including home rule municipalities. A resolution of this issue would involve this Court in the interpretation of the Home Rule Amendment of the Ohio Constitution, an issue best left to the jurisprudence of the state courts of the State of Ohio.

This Court is of course acutely aware that there are circumstances present in this case which mitigate in favor of this Court's exercise of pendent jurisdiction over the state law claims. These include the magnitude of the AmeriFlora project and its importance to the local, national, and international community. All of the parties desire a prompt resolution of these issues and the dismissal of the state claims will undoubtedly relegate the parties to the necessity of further litigation in the state courts. However, this Court's discretion to exercise pendent jurisdiction in the aftermath of the dismissal of the federal claims is limited and in the final analysis, the Court has concluded:

(1) that its discretion does not extend to the circumstances of the present case, and

(2) even if it does, the overwhelming public policy considerations involved in resolving the state claims convince this Court that it should not exercise its discretion to entertain jurisdiction but to leave those matters to the state courts which are infinitely better equipped to decide them.

Defendants' motion for summary judgment is granted as to the Third Claim of Plaintiffs' First Amended Verified Complaint and that claim shall be dismissed with prejudice. The Court's order of January 17, 1990 constitutes a final judgment on the Sixth and Eighth Claims of Plaintiffs' First Amended Verified Complaint and the 42 U.S.C. § 1981 claim set forth in the Seventh Claim of that Complaint. The remaining claims set forth in Plaintiffs' First Amended Verified Complaint shall be dismissed without prejudice.